'EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JUAN RIVERA BELTRÁN, acusado y apelante.

'Núms. 11526 y 11527.—*Sometidos:* Diciembre 2, 1946. *Resueltos:* Abril 17, 1947.

*Benjamín Ortiz* y *Alvaro Ortiz,* abogados del apelante; *Hon. Procurador General Interino Luis Negrón Fernández (E. Campos del Toro, ex Procurador General,* en el alegato), y *J. Correa Suárez, Fiscal Auxiliar del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

El apelante fué acusado de dos delitos de asesinato, cometidos en las personas de Máximo Velázquez y de Juan Velázquez. Como los actos delictivos formaron parte de una misma transacción y la prueba, naturalmente, era la misma en ambos casos, éstos se consolidaron para los efectos del

juicio. También han sido consolidados a los efectos de la apelación. El jurado lo declaró culpable: en el caso de Máximo Velázquez de asesinato en segundo grado y en el de Juan Velázquez de homicidio voluntario, siendo sentenciado a doce y cinco años de presidio, respectivamente. Apeló de las dos sentencias y señala cuatro errores. Los tres primeros se reducen a que el veredicto es contrario a la prueba y en el cuarto se queja de que la corte *a quo* no admitió el testimonio de una hermana del acusado con el cual la defensa se proponía probar el móvil que tuvieron los hermanos Velázquez para atacar al acusado y de ese modo establecer que Máximo y no el acusado fué el que primero atacó.

Pasemos a determinar si los veredictos encuentran apoyo en la prueba. Los testigos del fiscal que declararon sobre los hechos fueron Nicanor Burgos Vélez, Juan Rodríguez Soto, José Vega Delgado y Luis Velázquez Vélez.

*Nicanor Burgos Vélez* declaró que era pariente de los interfectos; que se hallaba cerca del sitio de los sucesos la noche de autos y oyó un grito que decía: "Ya lo mató"; que acudió al sitio y vió al acusado en lucha con Juan Velázquez y a un lado vió a Máximo Velázquez quejándose en el suelo; que vinieron los Sánchez y recogieron los heridos y el acusado se marchó; que al irse el acusado, Juan Velázquez quedó herido en el suelo; que el acusado tenía una cuchilla en la mano, como de ocho pulgadas de largo y que no vió que Juan Velázquez tuviera arma alguna.

*Juan Rodríguez Soto* declaró que a las ocho de la noche del día de autos se encontraba en una tienda que tenía el acusado a la orilla del camino real en el barrio Aguacate de Yabucoa; que llegaron a la tienda Máximo y Juan Velázquez, trayendo una botella de ron en las manos; que al llegar ellos, Máximo Velázquez dió un empujón al testigo y lo echó hacia el seto; que luego Máximo bajó al batey y le dijo al testigo: "Estamos bebiendo ron y si hay que pelear se pelea" y se fué a la esquina de la tienda y le dijo que él no intentaba tener disgustos con el testigo, que lo que él (Má-

ximo) procuraba era que el acusado interviniese para entonces atacarlo; que cuando Máximo volvió a la tienda se pusieron a pelear los tres, o sea, los hermanos Velázquez y el acusado; que vió cuando el acusado hirió a Máximo con la cuchilla que tenía en la tiendita; que cuando los tres estaban peleando llegó Luis Velázquez y le dió con un palo al acusado; que cuando Luis Velázquez lo atacó ya Máximo estaba herido; que Máximo fué el primero que sacó un cuchillo; que vió herido a Máximo, pero no vió herido a nadie más; que Juan Velázquez le tiró un palo al acusado, pero no logró alcanzarlo y al dar en la luz la apagó; que antes de que el acusado hiriera a Juan Velázquez éste le había atacado con el palo.

*José Vega Delgado* declaró que es pariente del acusado pero no lo era de Máximo ni de Juan Velázquez; que estando el testigo en el ventorrillo del acusado llegaron allí Máximo y Juan Velázquez en actitud alegre y saludaron y entraron trayendo Máximo una botella de ron; que Máximo dijo: "Señores yo traigo esto aquí para que nos demos un palo," pero las personas que estaban en el ventorrillo no aceptaron, excepto Juan Rodríguez Soto que tomó con los dos hermanos; que Máximo soltó la botella y dijo: "Pues nosotros tomamos y también si hay que pelear se pelea"; que entonces le puso la mano sobre el pecho a Juan Rodríguez Soto y le dió con el puño; que el acusado se metió por medio y dijo: "¿Qué es eso, Máximo? Dejen eso, dejen eso bendito"; que entonces Máximo dijo: "Está dejado"; que después no pasó nada más; que como un minuto después Juan Velázquez invisitaba a Máximo a irse, pero Máximo se resistía y el testigo se fué para su casa; que no vió que el acusado ni los hermanos Velázquez tuvieran armas; que el acusado estaba sobrio; que Máximo y Juan Velázquez estaban alegres porque habían tomado.

*Luis Velázquez,* último testigo del fiscal, declaró que el día de autos se encontró a sus hermanos Máximo y Juan en la tienda del acusado donde el testigo llegó a comprar unos

cigarros; que estaba oscureciendo y el testigo invitó a sus hermanos a retirarse; que el acusado bajó de la tienda con una cuchilla y le cayó a puñaladas a sus dos hermanos; que primero apuñaló a uno y entonces la emprendió con el otro y el testigo gritó y al gritar el acusado le asestó una puñalada que le cogió el lado izquierdo de la cara, mostrando la cicatriz al jurado; que el testigo se fué al ser herido; que Juan recibió seis puñaladas, cuatro se las dió estando Juan de pie y las otras dos después de haber caído; que cuando apuñalaba a Juan, Máximo estaba herido en el suelo; que Máximo no tenía armas ni Juan tampoco; que sus hermanos no habían atacado a nadie.

La prueba de descargo consistió de la declaración de *Miguel Montezuma* y de la del acusado. Montezuma se concretó a declarar que la tarde del día de autos se encontró con Máximo y Juan Velázquez; que llegaron a la tienda El Bobo, en el barrio Aguacate de Yabucoa como a las 3:30 de la tarde; que ellos lo invitaron a tomar licor y él aceptó; que lo invitaron a ir a la tienda del acusado y él les preguntó qué iban a hacer en casa del acusado y ellos le contestaron: "Pues nosotros vamos allá porque hoy matamos a Juan Rivera o Juan Rivera (el acusado) nos mata a nosotros"; que el testigo le dijo que no podía acompañarlos porque Juan Rivera era un hombre bueno, de buenas acciones y amigo suyo; que el testigo le dijo que iba para su casa y fué directamente a la tienda de Juan Rivera y le dijo: "Oigame, Máximo y Juan vienen para acá para matarlo a usted" y entonces el acusado le dijo: "¿Por qué, si yo no soy hombre de pelea? Yo no he hecho nada, lo único que uno de ellos está enamorado de una hermana mía pero yo no me he metido en nada de eso, así es que despreocúpese," y el testigo se fué.

Declaró el acusado que el 31 de agosto de 1942, como a las ocho de la noche, llegaron a su tienda por segunda vez los hermanos Velázquez; que al llegar dijo Máximo: "¿Qué

pasa?" y el testigo contestó: "No pasa nada"; que entonces dijo Máximo: "Pues si no pasa nada échate para abajo que a pelear es que venimos"; que el acusado se detuvo y Máximo subió y sacó el puño y le dió un puñetazo; que entonces Máximo sacó una cuchilla y le tiró una puñalada; que era un cuchillo de cocina como de cinco a seis pulgadas de largo; que Máximo le tiró la puñalada y el acusado la esquivó; que su cuchillo de partir tocino y bacalao estaba encima del mostrador y le costó defenderse con él infiriéndole la herida a Máximo; que al mismo tiempo subía Juan Velázquez y le tiró con un palo de higuillo; que al tirarle con el palo bajó la cabeza, dobló el cuerpo y entonces el palo le dió a la luz y se apagó y empezaron a luchar cuerpo a cuerpo.

A preguntas del fiscal declaró que Máximo era más alto, más grueso y más fuerte que él; que al quedarse a obscuras, el acusado empezó a tirar a tientas y a locas; que no sabe cuántas heridas infirió a Juan Velázquez;(1) que el testigo sabía que tiraba, pero como estaba a obscuras no sabe si el cuchillo se encajaba en el virote o en qué; que el acusado no

---

(1) Según aparece del certificado de autopsia admitido en evidencia, el cuerpo de Juan Velázquez presentaba las siguientes heridas:

"1. Una herida incisa de 2½ cms. en el aspecto anterior del hombro derecho en una penetración oblicua y superficial de 5 cms. en la región axilar derecha, sin causar daño en estructura de importancia alguna.

"2. Herida similar en la región lateral izquierda del tórax entre las costillas séptima y octava sin penetración en la cavidad de la pleura.

"3. Herida similar en la región media de la espalda al nivel de la séptima vértebra dorsal de 2.5 cms. de profundidad sin penetración de la cavidad de la pleura ni daño alguno a estructura de importancia.

"4. Herida similar en el lado izquierdo de la espalda a media pulgada de la línea media y al nivel del octavo espacio intercostal izquierdo de 2 cms. de penetración sin causar daño alguno a estructura de importancia.

"5. Herida incisa de aspecto similar a las anteriores pero de 4 cms. de largo en el lado derecho de la espalda a dos pulgadas de la línea media y al nivel del undécimo espacio intercostal que penetró la cavidad de la pleura derecha, perforó el diafragma en su parte posterior y penetró en el riñón derecho en el aspecto posterior de su polo superior, atravesando la parénquima' de dicho órgano, terminando la herida debajo del peritoneo parietal que cubre la parte anterior del riñón.

"6. Herida incisa de 2 cms. de largo a media pulgada de la anteriormente descrita, de 2 cms. de profundidad que no perforó la pared posterior abdominal."

salió herido. A preguntas de la defensa refiere la manifestación de Montezuma sobre el propósito de los hermanos Velázquez de matarlo.

Tal fué, en síntesis, la evidencia que tuvo ante sí el jurado. En verdad, las declaraciones de algunos testigos de cargo tienden a probar que fué Máximo Velázquez quien inició la riña, e hizo uso de armas antes que el acusado. En cambio, la del testigo Luis Velázquez tendió a probar que sus hermanos, los interfectos, estaban desarmados y que fué el acusado el primero en atacarlos. El jurado no venía obligado a traer un veredicto absolutorio por el hecho de que hubiese esa contradicción en los testigos de cargo. Su misión era determinar la verdad y dar crédito a aquel testigo, que a su juicio, lo mereciese, no importa el número de los que declarasen lo contrario. Parecen pertinentes las palabras del Juez Mac Leary en el caso de *El Pueblo* v. *Español*, 16 D.P.R. 213, 231–32:

"Se afirma por el apelante que el veredicto del jurado es contrario a las pruebas, y se ha hecho un gran esfuerzo para demostrar ésto, comparando entre sí las declaraciones de los diferentes testigos, y señalando las contradicciones que se alega existen en distintas partes de las declaraciones de determinados testigos, y especialmente en las de la denunciante y su hermano. Hay, sin duda, muchas contradicciones en las declaraciones de los diferentes testigos, comparando las unas con las otras, y algunas incongruencias en las varias deposiciones hechas por algunos de los testigos de cargo. Esto sucede en casi todos los juicios celebrados en causas criminales que sean muy discutidas. Pero es atribución y deber del jurado aquilatar las pruebas y armonizar, hasta donde fuere posible, las incongruencias o contradicciones que existan en las declaraciones de los testigos, y de separar los granos de verdad de la masa de materia falsa que se encuentre en las mismas, de acuerdo con las debidas instrucciones del tribunal, y de este modo llegar a un veredicto justo, fundado en los hechos que se hayan probado. Por lo que vemos de una detenida lectura de los autos y de los alegatos, ese deber se ha cumplido imparcialmente por el jurado, y no nos creemos justificados a decir que se haya cometido error alguno en cuanto a este particular. Otro jurado, en virtud de los mismos hechos, y bajo las debidas instrucciones, podía llegar a

un veredicto completamente distinto, y que nosotros sentiríamos la misma vacilación en revocar.

"No hay nada en estos autos que demuestre que el jurado que juzgó el presente caso en el tribunal inferior, haya sido movido, o en manera alguna haya sido influído por el apasionamiento, prevención o parcialidad; y en tales casos hemos declarado frecuentemente que este tribunal no modificará el fallo del juez sentenciador, ni anulará el veredicto del jurado."

El jurado dió crédito a la declaración de Luis Velázquez y no lo dió a las de otros testigos de cargo, en cuanto tendían a establecer que el acusado había dado muerte a Máximo y Juan Velázquez en defensa propia. Examinando la declaración del acusado, se notará que al describir la llegada de los interfectos a su tienda y al relatar la forma en que se inició la riña, difiere del relato que hacen aquellos testigos de cargo, cuyas declaraciones favorecen al acusado. Según éste, los interfectos llegaron a su tienda como a las ocho de la noche, por segunda vez, el 31 de agosto de 1942, y todo lo que sucedió en esa ocasión fué lo siguiente: Que al llegar Máximo preguntó al acusado "¿qué pasa?" y al contestarle que no pasaba nada, Máximo replicó: "Pues si no pasa nada, échate para abajo que a pelear es que venimos," y como el acusado se detuviera, Máximo subió y le agredió con el puño primero e inmediatamente después sacó un cuchillo y acometió al acusado sin lograr herirlo, siendo entonces que el acusado cogió un cuchillo que estaba sobre el mostrador y le infirió la herida que le causó la muerte.

El jurado probablemente consideró esta declaración del acusado en relación con las de José Vega Delgado y Juan Rodríguez Soto, quienes hicieron, especialmente el último, una descripción minuciosa de la llegada de los hermanos Velázquez a aquel sitio, distinta por completo de la que hizo el acusado y de la forma en que se inició la riña, según éste. Al considerar las declaraciones de dichos testigos de cargo, en relación con la del acusado y con la del testigo del fiscal Luis Velázquez, bien pudo el jurado llegar a la conclusión

de que los testigos de cargo cuyas declaraciones favorecían al acusado, no eran dignas de crédito. Estando el veredicto sostenido por la declaración de Luis Velázquez, a quien el jurado tenía derecho a dar crédito,(²) no debemos alterarlo, especialmente teniendo en cuenta que el jurado vió y oyó declarar los testigos y por su comportamiento en la silla testifical, estuvo en mejores condiciones que lo está ahora este Tribunal para determinar quiénes dijeron la verdad.

■■ Concedemos que el veredicto de homicidio voluntario, en relación con la muerte de Juan Velázquez, es erróneo, debiendo ser asesinato en segundo grado. Opinamos que es erróneo porque, suponiendo que Juan Velázquez atacase al acusado con un palo,(³) todos están contestes en que el palo se rompió sin que el acusado fuese agredido. Al atacarlo el acusado en la forma en que lo hizo, infiriendo seis puñaladas a un hombre desarmado, demostró tener un corazón pervertido y maligno. El delito cometido en esas circunstancias es el de asesinato en segundo grado. Pero ese error, lejos de perjudicar, benefició al acusado, y por consiguiente no puede producir la revocación de la sentencia.

■ Réstanos determinar ahora si erró la corte al no admitir la declaración de Carmen Rivera, hermana del acusado. Esta declaración se ofreció con el propósito de probar hostilidad contra el acusado por parte de Máximo Velázquez y la posibilidad de que fuera éste el que iniciara la riña.

La declaración que anunció la defensa que prestaría dicha testigo era sustancialmente así: Que hacía como cuatro años Máximo Velázquez la requirió de amores y ella lo re-

---

(²)Un testigo de cargo, Juan Rodríguez Soto, erróneamente dice al principio de su declaración que Luis Velázquez acometió con un palo al acusado, pero más adelante el mismo testigo rectifica imputando ese hecho a Juan Velázquez. La participación de Luis Velázquez, según su declaración, fué que gritó cuando vió que mataban a sus hermanos y el acusado lo atacó entonces con el cuchillo cortándole la cara.

(³)La evidencia revela que cuando Juan Velázquez atacó al acusado con un palo, ya su hermano Máximo había recibido la puñalada y se hallaba imposibilitado de continuar peleando.

chazó; que para aquella fecha él penetró en la casa de ella teniendo que denunciarlo por alteración de la paz.

El juez sostuvo la oposición del fiscal por el fundamento de que esa prueba era remota. Entonces la defensa anunció que también se proponía probar con la testigo que el día anterior al de autos Máximo Velázquez volvió a la casa de ella y le preguntó si estaba casada o soltera.

No parece dudoso que la primera parte de la propuesta declaración, es decir, lo ocurrido cuatro años antes, es remota. Pero de todos modos, la determinación de si la evidencia propuesta es o no remota, es cuestión que descansa en la sana discreción de la corte sentenciadora. 2 Wigmore, *Evidence,* (3ra. ed., 1940), sec. 396.

En cuanto a la última visita del acusado el día anterior al de autos, aparte de que es increíble,(4) su propósito era tan baladí, que la admisión de esa prueba en nada hubiera podido influir en la mente del jurado.

*Procede, por lo expuesto, confirmar las sentencias apeladas.*

Opinión disidente del Juez Asociado Sr. Todd, Jr., con la cual concurre el Juez Presidente Sr. Travieso.

A mi juicio, la prueba de cargo, incluyendo la declaración de Luis Velázquez, demostró que el acusado actuó como consecuencia de una súbita pendencia provocada por los hermanos Máximo y Juan Velázquez, o un arrebato de cólera, también consecuencia de dicha provocación. Aun cuando descartemos, como lo hizo el jurado, la teoría de que el acusado actuó en defensa propia, tanto la prueba de cargo (excepto Luis Velázquez) como la de descargo, demuestran que el acusado estaba en su tienda y que fueron Máximo y Juan Ve-

---

(4) Es increíble que viviendo Carmen Rivera y Máximo Velázquez en el mismo barrio por más de cuatro años por lo menos, con la oportunidad de verse a menudo y el interés que se pretende probar tenía él en ella, tuviese que ir Máximo a preguntarle lo que probablemente todos los vecinos del barrio sabían, es decir, si ella estaba soltera o casada.

lázquez los que en estado de embriaguez llegaron allí y lo provocaron y agredieron. Es de notarse, además, que Luis Velázquez llegó a la tienda después que sus hermanos y fué entonces que quiso llevárselos y éstos se negaron. Es significativo este hecho, pues si Máximo y Juan nada malo estaban haciendo, ¿qué motivo había para que su hermano Luis tratara de llevárselos?

En mi opinión el de autos no es un caso, como el de *El Pueblo* v. *Español,* 16 D.P.R. 213, citado por la corte, en el cual existan "contradicciones en las declaraciones de los diferentes testigos, comparando las unas con las otras y *algunas* incongruencias en las varias deposiciones hechas por algunos de los testigos de cargo." Aquí nos confrontamos con el hecho de que todos los testigos de cargo, con excepción de uno, Luis Velázquez, hermano de los interfectos, y quien también intervino en la reyerta y salió herido,[1] corroboran la teoría y la prueba del acusado de que éste actuó en ocasión de una súbita pendencia o arrebato de cólera. La declaración de Luis Velázquez es, además de interesada, increíble. Es increíble porque no habiéndose demostrado que el acusado estuviera loco o borracho, es inexplicable que procediera a atacar con una cuchilla a tres personas sin que nada hubiera ocurrido entre ellos. Y esto es lo que dicho testigo declaró. El sentido común y la razón natural nos indican que las cosas no ocurren así en la vida. Es cierto que corresponde al jurado dirimir el conflicto que pueda existir en la prueba y que generalmente respetamos su veredicto basado en la credibilidad que le merecen los testigos, pero esto no quiere decir que si hubo un manifiesto error en la apreciación de la prueba, o si ésta es de tal naturaleza que no justifica el veredicto, no podamos intervenir con el mismo.

A mi juicio la prueba fué suficiente para dejar demostrado, más allá de duda razonable, que a lo más lo que allí ocurrió fué consecuencia de una súbita pendencia o arrebato

---

[1] Se probó que el acusado había sido absuelto en el proceso por haber herido a este testigo Luis Velázquez.

de cólera (y así lo entendió el jurado en cuanto a uno de los veredictos) y que en su consecuencia el veredicto que rindió de asesinato en segundo grado, en el otro caso, no está sostenido por la prueba y procede su revocación.