EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JUSTO BLANCO CANDELARIO, acusado y apelante.

Números 15806–15807.

*Sometido:* 2 de diciembre de 1954. *Resuelto:* 30 de diciembre de 1954.

*Luis F. Candal*, abogado del apelante; *Hon. Secretario de Justicia Interino J. B. Fernández Badillo, Rafael L. Ydrach Yordán* y *Ramón Olivo Nieves, Fiscal y Fiscal Especial, respectivamente, Tribunal Supremo*, abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

El apelante fué juzgado ante un jurado de un delito de asesinato genérico consistente, según la acusación, en que el acusado "allá en o para el día 16 de octubre de 1953 y en Cabo Rojo, Puerto Rico, . . . . . . ilegal, voluntaria y criminalmente, con malicia, premeditación y deliberación y propósito firme y decidido de darle muerte ilegal, demostrando tener un corazón pervertido y maligno acometió y agredió al ser humano Pilar Vargas Ríos, con un cuchillo, que es un arma mortífera, hiriéndola y lanzándola al mar desde un bote de motor de su propiedad, mientras se encontraban a una distancia de una milla de la orilla del mar, muriendo dicha Pilar Vargas Ríos de axfixia por inmersión (ahogada) el mismo día 16 de octubre de 1953." También fué juzgado conjuntamente, pero ante tribunal de derecho, por la portación ilegal del cuchillo con el cual hirió a Pilar Vargas Ríos.

El jurado le declaró culpable de asesinato en segundo grado y por su parte, el juez que presidió el tribunal le declaró culpable de portar armas ilegalmente. Contra las sentencias dictadas en su contra en ambos casos, el acusado ha interpuesto sendos recursos de apelación, los que hemos consolidado a petición suya, y en los cuales señala los siguientes errores:

"Primero: El tribunal a quo erró al instruir al jurado, en perjuicio del acusado y no habiendo desfilado prueba alguna que lo justificare, sobre el delito de asesinato en segundo grado;

· "Segundo: El tribunal a quo erró al aceptar el veredicto de culpable de asesinato en segundo grado por ser éste contrario a la prueba y a derecho;

"Tercero: El tribunal a quo erró al declarar sin lugar la moción de nuevo juicio;

"Cuarto: El tribunal a quo erró al declarar culpable al acusado del delito de portar armas no habiéndose ésta ocupado ni descrito, ni establecídose por la prueba dicho delito."

Alega el apelante que la prueba en este caso no justificaba una instrucción al jurado sobre asesinato en segundo grado. En esta contención se fundan los tres primeros errores señalados. Por lo tanto, de ser la misma errónea, dichos tres errores caen por su base.

■■■ El fiscal de esta Corte resume correctamente la prueba de cargo y la de descargo, como sigue:

"La del ministerio fiscal demostró que el día 16 de octubre de 1953, el acusado Justo Blanco Candelario en unión de Hilarión Cuevas Torres y de Pilar Vargas Ríos y Carmen Ramos, prostitutas estas últimas, estuvieron tomando licor en un bar propiedad de Pedro Feliciano Candelario en el sitio conocido por Joyuda de la jurisdicción de Cabo Rojo. Ya de noche, el apelante invitó a sus acompañantes a dar un paseo en un bote de motor de su propiedad y el cual era usado por éste para la pesca. Cuando se encontraban retirados de la orilla, el apelante sostuvo relaciones sexuales con Pilar Vargas Ríos. Más tarde surgió una discusión entre ambos ya que éste pretendía que Pilar Vargas terminara las relaciones que sostenía con otro individuo y se dedicara a vivir únicamente con él. Pilar Vargas le manifestó, con respecto a este requerimiento, que ella quería al otro y no a él. El acusado, que momentos antes había sacado un cuchillo de cabo rojo y de cuatro pulgadas de largo de una capa, se abalanzó hacia ésta y la hirió en el lado derecho del pecho. Acto seguido la tiró al mar. Carmen Ramos, la otra mujer en el bote, se lanzó al mar con intención de salvar a su amiga. Inmediatamente el apelante viró el bote y todos cayeron al mar. Hilarión Cuevas Torres llegó hasta donde se encontraba Pilar Vargas Ríos pero ya ésta estaba muerta. Ayudó a su amiga Carmen Ramos hasta el bote y dejándola agarrada a un extremo de éste en compañía de Justo Blanco Candelario, salió a nado hacia la playa en busca de auxilio. Mientras tanto, los gritos de auxilio

de Justo Blanco Candelario y de Carmen Ramos fueron oídos en la playa por el señor Angel Rivera, quien en unión a José Monserrate Ruiz llegaron en otro bote hasta los náufragos y los trajeron hasta la playa.

"Para establecer esta prueba el ministerio fiscal ofreció los testimonios del Dr. Angel F. Padilla, quien practicó la autopsia del cadáver de Pilar Vargas Ríos, y de Hilarión Cuevas Torres y Carmen Ramos, conocida como Tongolele, quienes acompañaban al acusado y a la interfecta durante el paseo por mar. También ofreció prueba documental consistente en fotografías del cadáver de Pilar Vargas Ríos.

"La prueba de la defensa consistió en las declaraciones de los señores Pedro Feliciano Candelario, dueño del establecimiento donde las personas envueltas en este procedimiento estuvieron bebiendo durante las horas de la tarde del día 16 de octubre de 1953, Angel Rivera y José Monserrate Ruiz, quienes rescataron al acusado apelante y a Carmen Ramos del mar, María Esther Rodríguez cuyo testimonio tendió a establecer que Justo Blanco Candelario y la víctima vivían juntos y de Jesús del Valle quien dijo ser familiar de la interfecta y estuvo presente cuando trajeron el cadáver de ésta al cementerio para hacerle la autopsia.

"Las partes estipularon, además, el hecho de que el cadáver de Pilar Vargas apareció por el lado oeste o noroeste de la Isla de los Ratones y que fué encontrado por el señor Julio Agrait y un representante de la policía, quienes trajeron el cadáver hasta la playa de Joyuda donde se hicieron cargo de éste sus familiares. El propio acusado, Justo Blanco Candelario, ocupó la silla de los testigos. La teoría que surge de la prueba de defensa es al efecto de que cuando se encontraban un poco retirados de la playa, el acusado apelante Justo Blanco Candelario perdió su sombrero y al inclinarse para recogerlo, Pilar Vargas Ríos se inclinó a la vez sobre él, cayendo al agua donde murió accidentalmente."

De acuerdo con el testimonio del testigo de cargo, Hilarión Cuevas Torres, después que el acusado tuvo relaciones sexuales con Pilar Vargas Ríos, surgió una discusión entre ambos porque el acusado quería que ella dejara al marido que tenía y se fuera a vivir con él. Ante la negativa de Pilar, el acusado pronunció estas palabras: "Yo voy a virar este barco, el bote". "El que se salve va para Presidio." Entonces, sacó

un cuchillo de una capa y le dió con él a Pilar y la lanzó al agua. Inmediatamente el acusado viró el bote y todos sus ocupantes cayeron al agua. En el contrainterrogatorio este testigo declaró que cuando todos estaban en el agua oyó al acusado decir: "Déjalas que se ahoguen ahí."

La testigo Carmen Ramos, declaró lo siguiente: "Entonces el muchacho que andaba conmigo iba de espalda para donde mí tambíen, entonces Justo Blanco [el acusado] le dijo a Pilar [la interfecta] que a quién quería ella si lo quería a él o a su marido, entonces ella le dijo que quería más a su marido que ella no lo quería a él y él dijo que la iba a matar y la cogió y la tiró al agua . . . ."

Arguye el apelante que la teoría y la prueba del Pueblo se basaron en que el apelante tuvo la intención de matar a Pilar Vargas Ríos y que como la defensa que él adujo fué que el bote se viró accidentalmente, el jurado solamente podía rendir veredictos de asesinato en primer grado, homicidio voluntario o absolución. Sigue arguyendo que la instrucción sobre asesinato en segundo grado le perjudicó porque habiendo el jurado eliminado el asesinato en primer grado, el veredicto hubiera sido de homicidio voluntario o absolución, en ausencia de la instrucción sobre asesinato en segundo grado, instrucción ésta que provocó un veredicto por componenda. En apoyo de su contención el apelante cita el caso del *Pueblo* v. *Méndez*, 74 D.P.R. 913. El lenguaje pertinente que usamos en dicho caso es como sigue:

"En síntesis, en cuanto a la modalidad que estamos discutiendo, el asesinato en primer grado incluye los elementos de deliberación y de intención específica de matar. En el asesinato en segundo grado, basta la malicia premeditada, sin la intención específica deliberada de matar, o sea, se refiere a la intención de realizar un acto que resulte en la muerte, pero en virtud del propósito de causar daños corporales que puedan probablemente resultar en la muerte, y así resulten, sin que el actor haya tenido el propósito directo, específico y deliberado de matar. Ya la jurisprudencia sentada por este Tribunal ha determinado que el asesinato en primer grado se caracteriza por la deliberación y

la intención específica de matar, y no así en el segundo grado. *El Pueblo* v. *Lasalle,* 18 D.P.R. 421, 423; *Pueblo* v. *Carrión,* 35 D.P.R. 901; *Pueblo* v. *Garcés,* 29 D.P.R. 1029; *Pueblo* v. *Torres,* 34 D.P.R. 651; *El Pueblo* v. *Crespo,* 21 D.P.R. 300; *Pueblo* v. *Belardo,* 50 D.P.R. 512; *Pueblo* v. *Rosario,* 67 D.P.R. 371."

El apelante parece deducir de la cita antes transcrita que cuando en un asesinato está presente, porque así se infiera de la prueba, la intención específica de matar, el asesinato es uno en primer grado y no en segundo grado. En otras palabras, que la intención específica de matar es un elemento exclusivo del asesinato en primer grado. Quizás el lenguaje que usamos en el caso de *Méndez,* supra, pueda dar lugar a una interpretación errónea de la ley.

En primer lugar, cuando dijimos en el caso de *Méndez* que "ya la jurisprudencia sentada por este Tribunal ha determinado que el asesinato en primer grado se caracteriza por la deliberación y la intención específica de matar, y no así en segundo grado", no quisimos significar que el asesinato en segundo grado se caracteriza siempre por la ausencia de la intención específica de matar. Afirmamos correctamente en dicho caso que "[e]n el asesinato en segundo grado, basta la malicia premeditada, sin la intención específica *deliberada* de matar . . . ." (Bastardillas nuestras.) La jurisprudencia de este Tribunal ha sostenido que la diferencia entre uno y otro grado del delito de asesinato consiste en la ausencia de deliberación en el delito inferior.

Ninguno de los casos citados en el de *Méndez,* a excepción quizás de *Pueblo* v. *Garcés,* 29 D.P.R. 1029, sostiene, que la intención específica de matar, pero sin deliberación, convierte el delito de asesinato en uno de primer grado. En *Pueblo* v. *Garcés,* supra, dijimos lo siguiente:

"De acuerdo con las autoridades si un hombre da un golpe a otro con malicia premeditada y ocasiona la muerte, esto puede ser asesinato, dependiendo de las circunstancias según se desarrollen en la acusación misma o en el juicio. *Demato* v. *Peor*[z] 35 L.R.A., (N.S.) 621 y notas; 13 R.C.L. 777; *El Pue*[l·o] v. *Figueroa,* 16 D.P.R. 373; 21 Cyc. 712.

"Es suficiente que el acto ejecutado fuera malicioso, deliberado y premeditado y causara la muerte. Si hubo una intención en el momento, de causar la muerte, o el acto de que se acusa es uno de aquéllos específicamente enumerados en la ley como constitutivos de asesinato en primer grado, el acusado puede ser declarado culpable de asesinato en ese grado. Si el acto imputado no es uno de aquéllos específicamente enumerados en el artículo 201 del Código Penal y no hubo ninguna intención de matar, el asesinato puede ser en segundo grado, pero cualquier acto que sea malicioso, premeditado y deliberado y que cause muerte tiene que ser asesinato en primero o segundo grado."

Este lenguaje es sumamente confuso y además no creemos que el mismo contenga una exposición correcta de la ley. Es erróneo afirmar que si un hombre da un golpe a otro con malicia premeditada y ocasiona la muerte, el asesinato es siempre en primer grado si hubo una intención en el momento, de causar la muerte. De ser esto así, en el asesinato en primer grado la muerte no tendría que ser maliciosa, premeditada y deliberada. Bastaría con que fuera maliciosa y premeditada pero no *deliberada*. Es decir, si existe la malicia premeditada y la intención de matar, el delito sería de asesinato en primer grado aunque la muerte no hubiera sido *deliberada*. Esto es contrario a lo que dispone el Código Penal y a lo que hemos dicho en otras ocasiones y ahora repetimos al afirmar que la *deliberación* es un ingrediente de todo delito de asesinato en primer grado. Lo que ocurre es que siendo la deliberación un acto subjetivo del acusado, no puede probarse con evidencia directa y es preciso, por tanto, recurrir a los hechos del caso para determinar si de ellos puede racionalmente inferirse la deliberación.(1) *Pueblo* v. *Rosario*, 67 D.P.R. 371.

---

(1) Refiriéndonos al concepto de deliberación dijimos en uno de los escolios de la opinión en el caso de *Méndez*, lo siguiente: "En *People* v. *Bender*, 27 Cal.2d 164, 183, 185, se indica que el adjetivo 'deliberado' significa 'formado o determinado como resultado de un proceso cuidadoso de pensamiento y de consideración de distintos factores; formado en forma fría y serena, especialmente de acuerdo con un designio preconcebido . . . persona que delibera es la que pesa hechos y argumentos a los fines de llegar a una de-

Sí hemos dicho con claridad, e indudablemente es la misma teoría que quisimos seguir en el caso de *Méndez*, que puede cometerse el delito de asesinato en segundo grado, aun cuando no exista la intención definida de matar, siempre que el acto realizado por el acusado lo sea con malicia premeditada. En *Pueblo* v. *Belardo*, 50 D.P.R. 512, dijimos que quizás era un caso familiar de asesinato en segundo grado aquél en que una persona dispara a otra con intención meramente de herirla, pero por razón de algún descuido o debido a que la bala choca con otro objeto, mata a la víctima directamente, o la naturaleza de la herida produce su muerte, o se mata a un tercero; que el acusado en tal caso sería culpable de asesinato en segundo grado aunque no hubiera tenido la intención definida de matar a nadie, toda vez que el acto por él realizado lo fué con malicia premeditada. Véanse además, *Pueblo* v. *Guzmán*, 18 D.P.R. 836; *Pueblo* v. *Alegría*, 36 D.P.R. 393; *Pueblo* v. *Carrión*, 35 D.P.R. 901.

En el asesinato en segundo grado basta que se realice un acto ilegal con malicia premeditada y que dicho acto ocasione la muerte. En el ejemplo citado en el caso de *Belardo*, supra, si el acto en sí de disparar una persona a otra con intención meramente de herirla, y no de matarla, es malicioso y premeditado, entonces el delito cometido es uno de asesinato en segundo grado. Mas esto no significa que si al realizar el acto malicioso y premeditado de disparar se hace con la intención específica de matar, el delito cometido tenga que ser necesariamente el de asesinato en primer grado pues si de los hechos no se infiere que la intención definida de matar se concibió como consecuencia de la deliberación entonces el delito cometido sería de asesinato en segundo grado. En otras palabras,

cisión o selección; cuidadoso en considerar las consecuencias de una actuación . . . sin prisa . . . caracterizado por la reflexión . . . sin pasión . . . no impulsivo ni impetuoso.' Realmente, la definición sintética aplicable debe ser la que aparece en los diccionarios, o sea, deliberar consiste en considerar atenta y detenidamente el pro y el contra, esto es, las razones de nuestras decisiones o selecciones, antes de cumplirlas o realizarlas. Si un acusado ha deliberado en la forma expuesta es cuestión a ser resuelta por el jurado." (*Pueblo* v. *Méndez*, a la página 927.)

la intención definida de matar puede estar presente, aunque no es necesario que siempre lo esté, en el delito de asesinato en segundo grado.

En Puerto Rico como en California, donde existe un estatuto casi idéntico al nuestro, la intención específica de matar es un elemento integrante del delito de asesinato en primer grado. En lo que a California concierne los casos de *People* v. *Holt*, 25 Cal.2d 59; *People* v. *Thomas*, 25 Cal.2d 880; *People* v. *Bender*, 27 Cal.2d 164; *People* v. *Valentine*, 28 Cal.2d 121 y *People* v. *Martínez*, 38 Cal.2d 556, no han establecido una nueva doctrina, según afirmamos erróneamente en el caso de *Méndez*, al efecto de que la intención específica de matar no es un elemento integrante del delito de asesinato en primer grado. (²) En dichos casos se resuelve que la frase "intención específica de matar" no es sinónima de "malicia premeditada" y que tampoco "una intención maliciosa" y "ma-

---

(²) En *People* v. *Holt*, supra, se cita con aprobación el caso de *People* v. *Howard*, 211 Cal. 322, donde se define el asesinato en primer grado, como sigue:

"En el más reciente caso de *People* v. *Howard* (1930), supra, 211 Cal. 322, 329, la regla aplicable fué brevemente enunciada: 'Para construir asesinato en primer grado, bajo nuestra ley, la muerte debe ser premeditada, excepto cuando se comete durante la perpetración de ciertos delitos graves; esto es, *la muerte ilegal debe estar acompañada de una intención deliberada y clara de quitar la vida.*' "

En *People* v. *Thomas*, supra, se desaprobó por ser errónea, la siguiente instrucción al jurado:

"Si la muerte ilegal se comete sin la provocación y apasionamiento súbito que reducen el delito a *homicidio*, o se comete durante la comisión de un acto ilegal, cuyas consecuencias naturales sean peligrosas para la vida, o se comete durante la tentativa de perpetrar un delito grave que no sea uno de los mencionados en la descripción del asesinato en primer grado o si las circunstancias de la muerte demuestran un corazón pervertido, esto es asesinato en segundo grado, *a menos que la evidencia pruebe la existencia en la mente del matador la intención específica de quitar la vida. Si dicha intención específica existe al momento de la muerte ilegal, el delito cometido sería desde luego asesinato en primer grado.*"

Dicha instrucción indicaba claramente al jurado que si la intención específica de matar existía al tiempo de la muerte ilegal, el delito cometido era de asesinato en primer grado. Esto desde luego excluía el elemento de "deliberación" que es indispensable en ese delito. No se sostuvo pues que la instrucción fuera errónea porque se dijera que la intención específica de matar e un elemento integrante del delito de asesinato en primer grado sino

licia premeditada" son sinónimas de "voluntaria, deliberada y premeditada". Esto quiere decir en nuestras propias palabras que intención específica de matar no significa ni es equivalente a que la muerte ha sido ocasionada con premeditación y deliberación. La intención definida de matar puede existir en la mente del acusado en el momento de ocasionar la muerte, pero si de los hechos no se infiere que la existencia de la intención de matar es el resultado de un proceso de deliberación, el delito cometido es de asesinato en segundo grado. Como se ve California establece la diferencia entre los dos grados del delito de asesinato en la ausencia de deliberación en el delito inferior. Esto no implica sin embargo, que California haya establecido la nueva doctrina de que la intención específica de matar no es un elemento integrante del asesinato en primer grado.

Los citados casos de California confirman la tesis de que la "intención definida de matar" puede estar presente en el

---

porque no se dijo en dicha instrucción que la intención específica de matar que existía al momento de ocasionar la muerte ilegal debió ser el resultado de la deliberación para que pudiera calificarse el delito de asesinato en primer grado. En *Pueblo* v. *Bender,* supra, se resuelve que el asesinato en primer grado es un acto voluntario caracterizado por la presencia de malicia premeditada (*malice aforethought*) y una deliberada y premeditada intención de matar.

En *People* v. *Valentine*, supra, se dice:

"Alguna confusión adicional en cuanto a los grados del asesinato puede haber sido añadida debido a la instrucción de que cuando se demuestra aquel grado de provocación que reduce una muerte intencional a *homicidio* 'aunque la intención de matar existe, no es aquella *intención deliberada* y maliciosa que es un *elemento esencial* en el delito de *asesinato.*' (Bastardillas nuestras) [del tribunal de California]. El lenguaje de la instrucción citada últimamente es el de *Pueblo* v. *Freel* (1874), 48 Cal. 436, 437, citado en *Pueblo* v. *Elmore* (1914), 167 Cal. 205, 210 [138 Pac. 989], pero es incorrecta en cuanto distingue el homicidio del asesinato a base de intención deliberada y al declarar que la intención *deliberada* es un elemento esencial del asesinato. La intención deliberada, bajo la ley (Pen. Code, sec's. 187, 189) no es un elemento esencial del asesinato, como tal. Es un elemento esencial de una clase solamente de asesinato en primer grado y no es de ningún modo un elemento del asesinato en segundo grado."

De *People* v. *Martínez*, supra, copiamos lo siguiente:

"Un homicidio es asesinato en primer grado cuando el acusado, como resultado de la deliberación y premeditación, intentó quitar la vida ilegalmente a otro. (Pen. Code. sec. 189; *Pueblo* v. *Bender*, 27 Cal.2d 164, 178 [163 P.2d 8]."

delito de asesinato en segundo grado aunque tal intención no sea un elemento necesario de dicho delito. ([3])

■ Cuando en una acusación por asesinato, la imputación es que la muerte ilegal fué "intencional, premeditada y deliberada", corresponde al jurado determinar el grado del delito, a base de toda la evidencia que se le ha presentado. Desde luego, las deliberaciones del jurado están gobernadas por las normas fijadas por la legislatura, a saber: la muerte ilegal debe estar acompañada de la intención específica deliberada de matar para que el delito constituya asesinato en primer grado. *Pueblo* v. *Rosario*, supra; *People* v. *Thomas*, supra y *People* v. *Bender*, supra. La decisión del jurado debe estar sostenida por la prueba, y cuando tenga duda razonable respecto al grado del delito, debe darle el beneficio de esa duda al acusado y declararlo culpable de asesinato en segundo grado. *Pueblo* v. *Rosario*, supra. Examinemos nuevamente la prueba para determinar si ésta sostiene el veredicto de asesinato en segundo grado, y si en su consecuencia, el Juez estuvo justificado en instruir al jurado sobre dicho delito.

■■ El día de los hechos, el acusado estuvo tomando licor en compañía de la interfecta Pilar Vargas Ríos y de Carmen Ramos e Hilarión Cuevas Torres, desde las cinco de la tarde, según la prueba de cargo, y desde las nueve de la mañana, según la prueba de defensa. Como entre siete y siete y media de la noche, y a invitación del acusado, los cuatro se fueron a pasear en un bote de motor propiedad de aquél. Cuando estaban a una milla de distancia de la orilla del mar, el acusado tuvo contacto carnal con Pilar. Inmediatamente después surgió una discusión entre ellos dos. El acusado quería que Pilar dejara al marido que tenía y se fuera a vivir con él pero ella se negaba alegando que quería más a su marido.

---

([3]) Esta cuestión ha sido objeto de discusión en otras jurisdicciones. Véanse por ejemplo, *State* v. *Van Vlack*, 65 P.2d 736 (Idaho); *Ballentine* v. *State*, 132 S.W.2d 348 (Ark.); *Wims* v. *State*, 4 S.E.2d 418 (Ga.); *People* v. *Levan*, 64 N.E.2d 341 (N.Y.); *Pitts* v. *State*, 23 N.E.2d 673 (Ind.); *Spivey* v. *State*, 171 S.W.2d 140 (Tex.); *State* v. *Russell*, 145 P.2d 1003 (Utah); *State* v. *Kurz*, 37 A.2d 808 (Conn.).

Fué entonces cuando el acusado, armado de un cuchillo infirió una herida a Pilar y la arrojó al mar, virando luego el bote.

En el récord no hay prueba de que con anterioridad a la discusión el acusado hubiera tenido disgustos con Pilar, o que la hubiera amenazado. Por el contrario, la prueba revela que el día de los hechos estuvieron amigablemente tomando licor juntos; que Pilar aceptó voluntariamente la invitación para ir a pasear en bote y más aún, que voluntariamente tuvo relaciones carnales con el acusado. Es un hecho indiscutible que el acusado infirió la herida a Pilar y la arrojó al mar, con la intención definida de matarla, pero el jurado venía obligado a resolver si esa intención definida de matar fué o no el resultado de un proceso de deliberación. Pudo concluir, como concluyó, que no lo fué. Los hechos probados daban lugar a esa inferencia y si el jurado creyó que la muerte de Pilar no fué deliberada y premeditada, entonces era su deber rendir un veredicto de asesinato en segundo grado. Es verdad que para que exista la deliberación no es necesario que transcurra un determinado período de tiempo entre la intención específica de matar y la muerte misma, *Pueblo* v. *Rosario*, supra, pero esto no excluye la necesidad de que la intención de matar este precedida de premeditación y deliberación. En *People* v. *Thomas*, supra, se expone la doctrina en la siguiente forma:

"Desde la decisión en *Pueblo* v. *Sánchez* (1864), 24 Cal. 17, 30, se ha reiterado que: 'No es necesario que medie un intervalo de tiempo apreciable entre la intención de matar y el acto de matar; pueden ser tan instantáneas como pensamientos sucesivos de la mente,' pero esto no quiere decir que la *intención de matar* pueda formarse sin haber sido precedida por la deliberación y la premeditación. Es sólo una declaración en el sentido de que el acto de matar puede seguir instantáneamente a la intención una vez que la última haya tomado forma definitiva. No debe implicarse el que una reflexión completa (deliberación y premeditación) necesariamente no precedan la formación definitiva de la intención perversa. A base de su lenguaje se refiere solamente 'al intervalo de tiempo entre la intención de matar y el acto de matar'. En otras palabras, un asesinato es del primer grado no importa lo rápidamente que el acto de matar

siga a la formación definitiva de la intención si a esa intención se ha llegado con deliberación y premeditación. Esta perspectiva de la ley se manifiesta en el caso *Sánchez* a través de la declaración (en la pág. 30 de 24 Cal.) de que 'La intención de matar debe ser el resultado de la premeditación deliberada; debe formarse sobre una reflexión preexistente, y no sobre un arrebato de pasión suficiente para excluir la idea de deliberación.' Ni la ley ni el tribunal intentan medir en unidades de tiempo la duración del intervalo durante el cual el pensamiento debe ser ponderado antes de que madure en una intención que es verdaderamente deliberada y premeditada. El tiempo variaría de acuerdo con los individuos y bajo diversas circunstancias. La verdadera prueba no es tanto la duración del tiempo como el alcance de la reflexión. Los pensamientos pueden sucederse con mucha rapidez pudiendo llegarse a un juicio frío y calculador rápidamente, pero el requisito expreso de una concurrencia de deliberación y premeditación excluye del asesinato en primer grado aquellos homicidios (no enumerados específicamente en la ley), que son el resultado de un simple impulso momentáneo irreflexivo y precipitado." (*People* v. *Thomas*, 25 Cal.2d 880, 900–901 (1945).)

El acusado en este caso pudo haber concebido la intención de matar como resultado de un impulso irreflexivo al sentirse contrariado por la negativa de Pilar a vivir con él, llevando a precipitada ejecución dicho impulso. Esto puede constituir un asesinato en segundo grado. Por tanto no cometió error la corte al instruir al jurado sobre dicho delito.

Aceptamos que la prueba en este caso es suficiente para sostener un veredicto de asesinato en primer grado. Concediendo, sin embargo, a los fines del argumento, que dicha prueba no justifica una instrucción sobre asesinato en segundo grado, de haberse cometido error al trasmitir tal instrucción, el mismo no sería perjudicial al acusado ya que el jurado rindió un veredicto de asesinato en segundo grado. El argumento que hace el apelante al efecto de que como el jurado descartó el asesinato en primer grado, el veredicto hubiera sido de absolución si no se hubieran dado instrucciones de asesinato en segundo grado, descansa en una falacia. Si el jurado hubiera creído la teoría de defensa—que la muerte de

Pilar fué casual—le hubiera absuelto y nunca le hubiera declarado culpable de asesinato, en uno de sus dos grados.

En California se sostiene que el error cometido al trasmitirse instrucciones sobre un delito menor sin estar justificadas por la prueba no es perjudicial al acusado ni produce la nulidad del veredicto cuando éste ha sido rendido por el delito menor. En la obra "California Criminal Law" de Fricke, (4ª ed.), pág. 38, se hace un resumen de dicha doctrina en la siguiente forma:

"Aunque se ha sostenido que constituye un error instruir al jurado en cuanto a las cuestiones de derecho relacionadas con un delito menor incluído en el delito imputado, en aquellos casos en que, de acuerdo con la prueba, el acusado o era culpable del delito imputado o no culpable, las decisiones más recientes y eruditas sostienen que en ese caso el acusado no puede quejarse si el jurado que lo halló culpable llegó a un veredicto por un delito menor que lo favorecía más de lo que era de esperarse de acuerdo con los hechos. (*People* v. *Tugwell,* 32 Cal. App. 620; *People* v. *Stevens,* 5 Cal.2d 92; *People* v. *Washburn,* 54 Cal. App. 124; *People* v. *Alderson,* 105 Cal. App. 202; *People* v. *Jenkins,* 118 Cal. App. 115; *People* v. *Walcott,* 139 Cal. App. 355; *People* v. *Rucker,* 11 Cal. App.2d 609; *People* v. *Cota,* 53 Cal. App.2d 455.) En dichos casos la interpretación racional del veredicto debe ser en el sentido de que el jurado lo halló culpable del delito imputado y por el cual fué juzgado; y lo condenó por el delito menor, bien sea por una malinterpretación de la ley, que los hizo llegar a la conclusión de que el acusado era culpable del delito menor o por el deseo de ser lenientes con el acusado, pero no empece el error a favor del acusado, el veredicto es válido."

Esta doctrina ha sido ratificada en *People* v. *Ghione,* 115 Cal. App.2d 252 (1953) y estamos enteramente de acuerdo con ella.(⁴) En su consecuencia, los tres primeros errores no fueron cometidos.

---

(⁴) En *Pueblo* v. *Rivera,* 67 D.P.R. 194, habíamos resuelto ya que es erróneo un veredicto de homicidio voluntario cuando la prueba revela que el delito cometido es de asesinato en segundo grado, pero que ese error, lejos de perjudicar, benefició al acusado y por consiguiente no puede producir la revocación de la sentencia.

El cuarto error señalado es frívolo. La prueba del Pueblo es suficiente para sostener la convicción del acusado por el delito de portar armas. Es cierto que el arma no fué ocupada pero uno de los testigos del fiscal declaró ampliamente sobre ella y la identificó debidamente. Este testigo vió cuando el acusado sacó de una capa suya un cuchillo con el cual le dió a Pilar. La hoja de ese cuchillo medía como cuatro pulgadas de largo. El testigo había visto anteriormente ese mismo cuchillo en poder del acusado. Además el doctor Padilla declaró que la interfecta había recibido una herida en el lado derecho del pecho que le interesó un pulmón. Hubo prueba también, en el sentido de que esa herida fué producida por un objeto plano que pudo ser un cuchillo. "La ocupación del arma y su presentación como prueba no son absolutamente necesarias para una convicción—según alega el fiscal de esta Corte—si la otra prueba es bastante para concluir que en realidad de verdad el acusado portaba un arma prohibida. *Pueblo* v. *Ríos*, 41 D.P.R. 764; *Pueblo* v. *Guzmán*, 52 D.P.R. 458; *Pueblo* v. *Sánchez*, 50 D.P.R. 722." Aquí hubo esa otra prueba.

*No habiéndose cometido ninguno de los errores señalados, las sentencias apeladas serán confirmadas.*