EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>V.<br><br>José A. Concepción Guerra<br><br>Recurrido | Certiorari<br><br>2015 TSPR 162<br><br>194 DPR ____ |

Número del Caso: CC-2014-818

Fecha: 10 de diciembre de 2015

Tribunal de Apelaciones:

      Región Judicial de Bayamón

Oficina de la Procuradora General:

      Lcda. Margarita Mercado Echegaray
      Procuradora General

      Lcda. Tanaira Padilla Rodríguez
      Subprocuradora General

      Lcda. Eva Soto Castelló
      Procuradora General Auxiliar

Abogado de la Parte Recurrida:

      Lcda. Ivette Aponte Nogueras
      Lcdo. Alberic Prados Bou

Materia: Derecho Penal – Elemento de la premeditación para la configuración del delito de asesinato en primer grado; Ley de Armas – Art. 7.03, duplicación de la penas impuestas.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

     Peticionario

       v.                     CC-2014-0818

José A. Concepción Guerra

     Recurrido

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 10 de diciembre de 2015.

Este caso nos brinda la oportunidad de esclarecer los contornos del elemento de la premeditación en la configuración del delito de asesinato en primer grado. En particular, debemos precisar si un narcotraficante que libraba una guerra callejera cometió asesinato en primer grado al disparar contra un menor de edad bajo la creencia de que era un integrante de una organización criminal rival. Como segunda controversia, nos corresponde determinar si el Art. 7.03 de la Ley de Armas, infra, autoriza la duplicación de las penas impuestas sobre un acusado con agravantes o atenuantes.

I.

El 17 de abril de 2008, a eso de las 10:00 p.m., el menor de trece años de edad Eliezer O. Encarnación Alicea (Eliezer) salió a jugar con un grupo de niños en la urbanización donde vivía. Mientras Eliezer jugaba al esconder con sus vecinos por las calles y los pasillos entre las casas de la urbanización Bosque de las Palmas de Bayamón se acercó a la propiedad FF-16. En ese momento, Giancarlo, uno de los niños que jugaba con Eliezer y a quien le correspondía el turno de buscar y encontrar a sus amigos, escuchó dos fuertes detonaciones. Al llegar al pasillo colindante entre las residencias FF-16 y FF-17, de donde provino el sonido, Giancarlo observó el cuerpo inerte de Eliezer tendido en el suelo. A la distancia pudo ver que en el patio posterior de la casa FF-16 se alejaba un hombre alto, blanco y con una tenue barba. De inmediato se dirigió donde el Dr. Cirilo Encarnación Kuilan, padre de Eliezer.

Al oír el ruido de los disparos, la señora Ramos —residente de la propiedad FF-17— salió de su casa y se dirigió al área del pasillo entre su casa y la FF-16. Allí vio al menor Eliezer en el suelo y al notar que no reaccionaba, corrió donde su hija y le solicitó que llamara al 9-1-1. Cuando se encontraba en el pasillo entre ambas residencias, la señora Ramos sintió que el portón de la casa FF-16 se abrió y avistó a tres sujetos salir a toda prisa de su interior. Estos se montaron en dos vehículos y partieron a toda marcha.

El padre de Eliezer también escuchó las detonaciones pero pensó que se trataba de petardos. Este acomodaba la bicicleta de su hijo en la marquesina de su hogar cuando vio a Giancarlo correr en su dirección. El menor le informó que Eliezer yacía en el piso del pasillo entre las propiedades FF-16 y FF-17. El padre de Eliezer se dirigió de prisa al lugar y allí encontró el cuerpo de su hijo acostado boca arriba. Rápidamente buscó a su esposa y junto a otro vecino, también médico, intentaron sin éxito revivir el cuerpo inanimado del menor. Entonces, su madre le levantó la camisa y notó el fatal disparo en el tórax que atravesó su corazón y causó su muerte al instante.

Aproximadamente a las 10:07 p.m., la guardia de seguridad de la urbanización en turno observó cuando una guagua Toyota FJ color crema seguida por un automóvil gris marca Scion salieron apresuradamente de la urbanización. A esta le extrañó que ambos vehículos tuvieran las luces apagadas. Inmediatamente, tras la salida de los autos, el hijo de la señora Ramos llegó para indicarle lo sucedido y solicitarle que llamara al 9-1-1.

Poco tiempo después, los agentes de la Policía de Puerto Rico y el personal del Instituto de Ciencias Forenses, entre otros, llegaron al lugar de los hechos. En la escena encontraron un casquillo calibre .45 y notaron un impacto de bala en una de las paredes internas de la marquesina de la casa FF-16. A través de una de las ventanas de cristal, una agente de la policía observó un

cargador de municiones y lo que parecía ser un silenciador dentro de la casa.

Alrededor de las 12:30 a.m., el Sargento Baldwin Alvarado Reyes llegó a la escena junto al Fiscal de turno. Desde el exterior de la propiedad, el Sargento Alvarado Reyes pudo observar peines de armas de fuego calibre .45, parafernalia relacionada con sustancias controladas y una cantidad significativa de dinero. Por consiguiente, procedió a hacer un registro preventivo desde el exterior para ver si había alguien herido o muerto, o si permanecía alguna otra persona armada en la propiedad. Concluida la inspección preventiva, el Sargento Alvarado Reyes procuró una orden judicial para llevar a cabo un allanamiento en la residencia. Luego de obtener y diligenciar la orden en la propiedad FF-16 se ocupó una gran cantidad de evidencia.[1]

Posteriormente y por motivos ajenos a los hechos de este caso, el recurrido, Concepción Guerra, fue arrestado e ingresado en la cárcel de Guayama. Por su parte, el confinado Jonathan Machuca Rosario también fue trasladado a dicha institución para extinguir sus condenas. Allí creó cierto grado de amistad con el recurrido, Concepción Guerra. Este último, con la ayuda de Machuca Rosario, comenzó a introducir drogas y teléfonos celulares a la

---

[1] Incautaron drogas, parafernalia vinculada a sustancias controladas, dinero, motoras, un cargador con municiones [al cual le faltaba una bala], municiones de diferentes calibres, incluido el calibre .45. También ocuparon seis gorras, una máscara, cabellos, latas, una sábana con sangre, una cámara y una computadora, entre otros objetos. No encontraron armas de fuego.

institución correccional de Guayama. <u>Transcripción de la Prueba</u>, 4ta Transcripción, Piezas 1-2, págs. 115-119.

Según testificó Machuca Rosario durante el juicio, en una ocasión le preguntó al recurrido, Concepción Guerra, sobre los rumores de la muerte de un niño en Bayamón como parte de una conversación que sostuvieron sobre supuestos "abusos" de la organización Ñeta. En específico, este inquirió "si era verdad lo que decían que lo que él había hecho con el chamaquito ese era un abuso". <u>Transcripción de la Prueba</u>, 4ta Transcripción, Piezas 1-2, pág. 122. Según Machuca Rosario, Concepción Guerra le contestó que no lo veía como un abuso pues él tenía una guerra en la calle con "Bolo" y ese día escuchó ruidos en la parte de atrás de la casa junto a una voz que dijo "cógelo, cógelo", por lo que creyó que era "el enemigo" y le disparó al niño. <u>Transcripción de la Prueba</u>, 4ta Transcripción, Piezas 1-2, págs. 124-125. Además, le dijo que en ese momento entró nervioso a la casa y le contó lo sucedido a su padrastro y a un individuo conocido como "Gordo". <u>Transcripción de la Prueba</u>, 4ta Transcripción, Piezas 1-2, pág. 125. Confesó que acto seguido, los tres "salieron a las millas". Machuca Rosario también declaró que le preguntó al recurrido, Concepción Guerra, si había dejado alguna evidencia en la propiedad. Este último respondió que dejó dinero, motoras y varias gorras.

Ante estos hechos, se presentaron denuncias contra el recurrido, Concepción Guerra, por violación del Art. 106

del Código Penal de Puerto Rico de 2004, 33 LPRA sec. 4734, y por infringir los Art. 5.04 y 5.15 de la Ley de Armas de Puerto Rico, 25 LPRA secs. 458c y 458n. Tras los trámites de rigor, el 9 de abril de 2012 comenzó el juicio en su fondo por tribunal de derecho. Concluido el desfile de la extensa prueba testifical y documental de ambas partes, el Tribunal de Primera Instancia emitió un fallo de culpabilidad por los delitos imputados en contra del recurrido, Concepción Guerra.

Acto seguido, el Ministerio Público presentó una *Moción Solicitando Agravantes*. Oportunamente, el recurrido, Concepción Guerra, se opuso y procuró la reconsideración del fallo condenatorio. El foro de primera instancia dictó sentencia e impuso a Concepción Guerra una pena de noventa y nueve años de cárcel por el delito de asesinato en primer grado, veinte años por violación del Art. 5.04 de la Ley de Armas, supra, y diez años por violación del Art. 5.15 de la Ley de Armas, supra.[2] En cuanto a las violaciones de la Ley de Armas, por disposición del Art. 7.03 de dicha legislación, 25 LPRA sec. 460b, el Tribunal de Primera Instancia duplicó las penas a cuarenta y veinte años de reclusión, respectivamente.

---

[2] Las penas fijas para las infracciones a los artículos 5.04 y 5.15 son de diez y cinco años de reclusión, respectivamente. Estas penas pueden variar ante la existencia de agravantes —hasta un máximo de veinte años de reclusión en el Art. 5.04 y diez años en el Art. 5.15—, o de atenuantes —hasta un mínimo de cinco años en el Art. 5.04 y un año en el Art. 5.15—. Véase 25 LPRA secs. 458c. y 458n.

Inconforme, el recurrido, Concepción Guerra, presentó un recurso de apelación ante el Tribunal de Apelaciones. Alegó la comisión de cinco errores, la mayoría con respecto a la apreciación y evaluación de la prueba que hiciera el juzgador de los hechos. Luego de considerar la transcripción de la prueba y el derecho aplicable, el foro apelativo intermedio entendió que la evidencia presentada no era suficiente para determinar que hubo premeditación y deliberación, elemento requerido para el delito de asesinato en primer grado. Como resultado, redujo el fallo de culpabilidad a uno por asesinato en segundo grado. De igual forma, modificó las penas impuestas por las infracciones a la Ley de Armas. El tribunal apelativo intermedio interpretó que el Art. 7.03, supra, permite duplicar únicamente la pena fija establecida para los delitos imputados, y no así la pena aumentada o reducida que sea impuesta tras considerarse probado algún agravante o atenuante.

Insatisfecho con el dictamen, el Ministerio Público presentó ante nos un recurso de certiorari en el que señaló que el Tribunal de Apelaciones erró al reducir la condena de asesinato en primer grado a segundo grado, ya que el Ministerio Público demostró que se trató de un asesinato deliberado, y al reducir las penas por violaciones de los Artículos 5.04 y 5.15 de la Ley de Armas puesto que el recurrido era reincidente y se podían duplicar las penas

agravadas conforme a lo dispuesto en el Art. 7.03 de la Ley de Armas.

El 12 de diciembre de 2014 expedimos el auto de certiorari. Con el beneficio de los argumentos de ambas partes procedemos a resolver.

II.

La primera controversia que debemos resolver en este caso redunda en si el Ministerio Público probó el elemento de premeditación de manera que proceda una condena por asesinato en primer grado.

La profesora Dora Nevares-Muñiz ha expuesto lo siguiente acerca del elemento de la premeditación en el derecho de Puerto Rico:

> La palabra deliberación en Puerto Rico **se ha entendido como la resolución de matar después de darle alguna consideración por un periodo de tiempo.** Sin embargo, esa definición es lo que corresponde a la premeditación tanto en los tipos legales de la tradición civilista como en las jurisdicciones norteamericanas que adoptaron el esquema de la Ley de Homicidios de Pennsylvania de 1794, que dividió los asesinatos en grados. (Énfasis suplido). Nevares-Muñiz, 23 Rev. Jur. UIA 1, sec. 1.4 (1988).

Entre las primeras expresiones de este Tribunal sobre el elemento de la premeditación se destacan las expuestas en el caso El Pueblo v. Lasalle, 18 DPR 421 (1912). En aquella ocasión reconocimos que el foro de instancia expuso acertadamente que "si nace en nuestra mente una idea que nos lleva a la comisión de un acto, después de haberlo pensado, de haberlo meditado, de haberlo deliberado, y después de haber resuelto su ejecución, eso es

premeditación[…]". Íd., pág. 432. Al pasar juicio sobre la corrección de las instrucciones que le fueron provistas a los miembros del jurado, delineamos detalladamente los contornos de la figura de la premeditación. Por lo importante que resulta para la correcta disposición de este caso, incluimos íntegramente lo discutido en ese entonces:

> La palabra premeditación quiere decir **pensar de antemano**, como cuando un hombre piensa respecto la comisión de un acto, y concluye y determina en su mente cometer el acto. Él entonces ha premeditado la comisión del acto. La ley no da regla alguna respecto al tiempo que debe transcurrir entre el momento cuando una persona premedita o llega a una determinación en su mente de matar a otra persona y el momento cuando él realiza el acto de matar. **No es cuestión de tiempo**. **Es meramente una cuestión de si el acusado ha formado o no en su mente la determinación de matar al interfecto, y entonces algún tiempo posterior, inmediato o remoto lleva a efecto su determinación, previamente formada, matando al interfecto.** Si existe una intención de matar y el acto de matar ocurre simultáneamente, entonces no hay premeditación. Si el prisionero pensó el propósito de matar bastante tiempo para formar un designio fijado de matar, y a un tiempo posterior, no importa tan seguido o tan remoto, lo puso en ejecución, había suficiente premeditación para justificar al jurado en presentar un veredicto de asesinato en primer grado. (Énfasis suplido). Íd., pág. 433.

En Pueblo v. Rosario, 67 DPR 371 (1947) interpretamos el concepto de la deliberación y, de forma consistente, mencionamos que no es necesario el transcurso de determinado periodo de tiempo para su configuración. Detallamos que "[l]a deliberación, es la resolución o decisión de matar, **después de darle alguna consideración**; pero **cualquier período de tiempo, por corto que sea, es suficiente para que pueda tener lugar la deliberación.** Ese

lapso[…], puede ser tan rápido como el pensamiento." (Énfasis suplido). Íd., pág. 375. Ilustrados por el tratamiento brindado a estas figuras en las jurisdicciones estatales de California y Oregon, advertimos que la facultad de deliberar o premeditar la poseen solamente aquellos que tienen una mente libre de pasión o excitación, por lo que no puede decirse que cualquier espacio de tiempo permite una oportunidad para deliberar y premeditar si la mente del acusado estaba inhibida o perturbada. Íd., pág. 376. Lo anterior demuestra que percibimos como determinante la capacidad mental que permite deliberar o premeditar y no la cantidad de tiempo que haya podido transcurrir entre el designio de matar y su ejecución.

Pocos años después, en Pueblo v. Méndez, 74 DPR 913 (1953), puntualizamos en la capacidad mental necesaria, sin sujeción al factor del tiempo, e insertamos el ingrediente del estado de serenidad y la sangre fría en el razonamiento. Por ende, sostuvimos que:

> El término premeditación significa que el acto fue preconcebido y realizado después de reflexionado. Deliberación significa un estado de serenidad o sangre fría. No significa calcular o reflexionar durante mucho tiempo, sino una intención o propósito de matar ejecutado por el acusado en un estado de serenidad, como consecuencia del deliberado propósito de satisfacer una pasión o venganza, o para ejecutar cualquier otro acto ilegal. Es suficiente que el designio de matar existiese cuando se produjo la herida mortal. (Énfasis suplido). Íd., pág. 923.

Al siguiente año, en Pueblo v. Blanco, 77 DPR 767 (1954), reiteramos que el proceso mental subjetivo que supone que el individuo criminal ha deliberado o

premeditado su acto de matar aunque fuera por poco tiempo.

A tales efectos dijimos:

> **En otras palabras, un asesinato es del primer grado <u>no importa lo rápidamente que el acto de matar siga a la formación</u> definitiva de la intención <u>si a esa intención se ha llegado con deliberación y premeditación</u>**. Esta perspectiva de la ley se manifiesta en el caso Sánchez a través de la declaración de que la intención de matar debe ser el resultado de la premeditación deliberada; debe formarse sobre una reflexión preexistente, y no sobre un arrebato de pasión suficiente para excluir la idea de deliberación. **Ni la ley ni el tribunal intentan medir en unidades de tiempo la duración del intervalo durante el cual el pensamiento debe ser ponderado antes de que madure en una intención que es verdaderamente deliberada y premeditada.** El tiempo variaría de acuerdo con los individuos y bajo diversas circunstancias. **<u>La verdadera prueba no es tanto la duración del tiempo como el alcance de la reflexión</u>**. Los pensamientos pueden sucederse con mucha rapidez pudiendo llegarse a un juicio frío y calculador rápidamente, pero el requisito expreso de una concurrencia de deliberación y premeditación excluye del asesinato en primer grado aquellos homicidios…, que son el resultado de un simple impulso momentáneo irreflexivo y precipitado. (Énfasis suplido). <u>Íd.</u>, págs. 779-780.

En años subsiguientes, nuestra jurisprudencia mantuvo esta delicada relación entre la inexistencia de un tiempo determinado para configurar el elemento de la premeditación y la exigencia indispensable del proceso mental del acusado para concluir que el acto de matar fue premeditado.[3] En esa

---

[3] Véase, por ejemplo, <u>Pueblo v. Barreto Pérez</u>, 85 DPR 752, 761 (1962)("No es necesario que transcurra espacio alguno de tiempo entre la muerte y el propósito o designio de matar; solamente es necesario que el acto de matar sea precedido por la ocurrencia de la voluntaria deliberación y premeditación del agente del delito, sin tener en cuenta la rapidez con que pudieran sucederse entre sí los actos del pensamiento, ni la rapidez con que pueda suceder el acto de matar. El término premeditación significa que el acto fue preconcebido y realizado después de reflexionado"); <u>Pueblo</u>

misma línea, en <u>Pueblo v. Negrón Ayala</u>, 171 DPR 406, 419 (2007), resolvimos que cualquier período de tiempo, por corto que sea, es suficiente para que pueda tener lugar la deliberación. A esos efectos, reafirmamos que "la premeditación [y la deliberación] puede[n] formarse en un instante antes del acto, y puede[n] existir[…] no obstante la rapidez con que el acto se haya realizado". <u>Íd.</u>, pág. 420.

En la reciente opinión de <u>Pueblo v. Rodríguez Pagán</u>, 182 DPR 239 (2011) dijimos, citando a la profesora Nevares-Muñiz, que "[el] elemento de deliberación se refiere a la decisión formada como resultado de pensar y pesar cuidadosamente las consideraciones en pro y en contra del propuesto curso de acción". <u>Íd.</u>, pág. 248. Además, aludimos a nuestros precedentes para enfatizar nuevamente que cualquier periodo de tiempo, por corto que sea, es suficiente para que pueda tener lugar la deliberación. <u>Íd.</u> No obstante, estas expresiones han creado cierta confusión en la academia y la judicatura.

En su sentencia, el Tribunal de Apelaciones alertó que el énfasis brindado recientemente por este foro a la

_____

<u>v. Merced Jiménez</u>, 100 DPR 270, 281 (1971)("La deliberación es la resolución o decisión de matar, después de darle alguna consideración; pero cualquier período de tiempo, por corto que sea, es suficiente para que pueda tener lugar la deliberación. Ese lapso, sostienen las autoridades, puede ser tan rápido como el pensamiento".); <u>Pueblo v. Torres Montañez</u>, 106 DPR 125, 129 (1977)("Hemos afirmado que la deliberación es la resolución[…] de matar, después de darle alguna consideración; pero cualquier período de tiempo, por corto que sea, es suficiente para que pueda tener lugar la deliberación".).

velocidad con la cual se puede formar la premeditación crea cierta imprecisión. Igualmente, el profesor Luis E. Chiesa Aponte plantea que parece contradictorio sugerir, por un lado, que la deliberación requiere sopesar cuidadosamente los argumentos a favor y en contra de matar y, por otro lado, que la deliberación puede manifestarse en cualquier período de tiempo, por más corto que sea. L. E. Chiesa Aponte, Derecho Penal Sustantivo, 81 Rev. Jur. UPR 343, 367 (2012). El profesor Chiesa Aponte reconoce que la posible contradicción responde a la coexistencia de dos teorías doctrinales sobre cómo concebir la premeditación en las jurisdicciones estatales.[4] Una corriente de pensamiento sostiene que el elemento de la premeditación se encuentra presente si el acusado ha sopesado en su mente la determinación de matar sin necesidad de que medie un intervalo determinado de tiempo entre la intención de matar y el acto de matar. De otra parte, una doctrina alterna supone que para alcanzar el elemento de premeditación se requiere una cantidad de tiempo considerable a través del cual se sopesen las consideraciones del acto delictivo. Consecuentemente, el profesor Chiesa Aponte nos urge a

---

[4] Según la profesora Kessler Ferzan, diez estados permiten que la premeditación tenga lugar tan pronto como un instante antes de que la acción delictiva se produzca, seis estados permiten que exista premeditación instantáneamente o simultáneamente con el acto de asesinato, mientras que nueve jurisdicciones, ya sea por ley o jurisprudencia, requieren "un lapso considerable de tiempo". Así, a pesar del uso del término "premeditación", la mayoría de las jurisdicciones no requieren ninguna cantidad específica de tiempo para conformar ese elemento. K. Kessler Ferzan, Plotting Pre-meditation's Demise, 75 Law & Contemp. Probs. 83, 88 (2012).

reconocer la tensión irreconciliable que existe entre ambas y a optar por definitivamente seguir una o la otra. Íd.

En el siglo pasado escogimos la primera corriente y el desarrollo posterior de la figura de la premeditación en nuestro ordenamiento se ha mantenido por este sendero. Esta vertiente ha sido objeto de crítica en la academia estadounidense por tener el efecto de equiparar la premeditación con la intención de matar, desvirtuando así la distinción entre asesinatos en primer y segundo grado.[5] Aun así, hemos sido enfáticos en que la ausencia de una fórmula predeterminada de tiempo necesario no debe menguar la vital exigencia del requerido estado mental del acusado como ingrediente determinante para hallar la presencia del elemento de la premeditación. Es decir, aunque nos reiteramos en que en nuestro ordenamiento no es necesario que medie un intervalo de tiempo determinado entre la intención de matar y el acto de matar, esto no quiere decir que el delito de asesinato en primer grado pueda formarse sin ser precedido por la deliberación y la premeditación del acto. Pueblo v. Blanco, supra, a la pág. 779. Premeditar implica pensar el acto delictivo antes de ejecutarlo. Es un estado mental especial con contornos definidos y equivale, como hemos visto, a un estado en que

---

[5] De igual forma, la propia exigencia del elemento de la premeditación para el delito de asesinato en primer grado ha sido criticada y fue eliminada del Código Penal Modelo. Véase J. Dressler, Rethinking Criminal Homicide Statutes: Giving Juries More Discretion Eighth Annual Criminal Law Symposium: Homicide: Luncheon Keynote, 47 Tex. Tech L. Rev. 89, 93 (2015) y M. A. Pauley, Murder by Premeditation, 36 Am. Crim. L. Rev. 145, 166 (1999).

el actor considera distintos factores y razones en cuanto a la naturaleza del acto y sus consecuencias. Pueblo v. Méndez, supra, pág. 931. Ahora bien, según correctamente expone el profesor Chiesa Aponte "[l]a deliberación no puede reducirse a que el sujeto haya tenido la intención específica de matar. Una cosa es desear matar a la víctima (o sea, tener intención específica de matar) y otra cosa es sopesar los pros y los contra de matarla (o sea, matar con deliberación). Se trata de elementos subjetivos distintos". L. E. Chiesa Aponte, supra, pág. 366.

En consecuencia, reiteramos que un asesinato podrá ser catalogado bajo esta modalidad de primer grado si a la intención de matar se ha llegado después de darle alguna consideración, sin importar lo rápido que el acto de matar suceda a la formación definitiva de tal intención. En ese sentido, no vemos contradicción con lo expuesto en Pueblo v. Rodríguez Pagán, supra. En fin, el elemento de la premeditación no es una cuestión de tiempo sino del estado mental subjetivo del acusado.

En nuestra decisión pesa el historial legislativo brindado a esta figura. El concepto de la premeditación ha estado presente en la tipificación de los delitos de asesinato desde el Código Penal de 1902 hasta el vigente.[6]

---

[6] La división en grados del delito de asesinato tiene su origen en la Ley de Homicidios de 1794 del estado de Pennsylvania. Esta se incorporó a nuestro Código Penal en 1902 procedente de la edición del Código Penal de California de 1872. El Art. 83 del Código Penal de 1974 mantuvo una redacción similar a la de su antecesor de 1902. Asimismo, el Código Penal de 2004, al igual que el de 2012,

No empece lo anterior, es importante destacar que al aprobarse el texto del Artículo 106 del Código Penal de 2004, se abandonó la enumeración de varios elementos subjetivos —alevosía, deliberación y premeditación— que contenía la redacción del delito de asesinato en primer grado en el Art. 83 del Código Penal de 1974, para sustituirlos por el término premeditación que corresponde al concepto utilizado tradicionalmente **para expresar la necesidad de una deliberación previa a la decisión criminal.**[7] Véase D. Nevares-Muñiz, Código Penal de Puerto Rico de 2004, actualizado y comentado, 5ta Ed., San Juan, Instituto para el Desarrollo del Derecho, 2012, págs. 146-147. Como resultado, el término premeditación se fusionó al concepto de deliberar y fue definido como "[l]a deliberación previa a la resolución de llevar a cabo el hecho luego de darle alguna consideración por un período de

---

optó por mantener la división de grados de asesinato. Véase D. Nevares-Muñiz, Código Penal de Puerto Rico de 2012, Comentado, San Juan, Instituto para el Desarrollo del Derecho, 2012, pág. 138.

[7] Durante la aprobación del Código Penal de 2004, la Asamblea Legislativa percibió que la distinción entre premeditación y deliberación bajo el esquema del Código Penal de 1902 y 1974 creaba serias dificultades al momento de distinguir cuándo el acto premeditado se convertía en uno deliberado, ya que ambos términos presuponen que el acto fue pensado de antemano. Como resultado, se concibió que el mejor curso a seguir era abandonar esta distinción y unir ambos conceptos bajo el término de premeditación. Por otro lado, se eliminó el elemento de la alevosía pues este respondió a un error en la traducción del término "willful" del inglés al español en el Código de 1902. En ese sentido, se interpretó que su inclusión era innecesaria pues los actos intencionales son, necesariamente, voluntarios. Véase Informe sobre el P. del S. 2302 de la Comisión de lo Jurídico del Senado de 22 de junio de 2003, 5ta Sesión Ordinaria, 14ta Asamblea Legislativa, págs. 43-44.

tiempo". Art. 14(dd) del Código Penal de 2004, 33 LPRA ant. sec. 4642(bb). Además, constituye un elemento de una modalidad del delito de asesinato en primer grado bajo el derogado Art. 106 del Código Penal de 2004, 33 LPRA ant. sec. 4734(a).[8]

Es menester señalar que las críticas pragmáticas formuladas a las jurisdicciones que no presentan una exigencia de consideraciones de tiempo como requisito necesario para que exista la premeditación han estado presentes mucho antes de la aprobación del Código Penal de 2004. Aun así, cuando el legislador procuró enmendar exhaustivamente nuestro ordenamiento penal sustantivo, y fusionó los términos de deliberación y premeditación, avaló abiertamente la interpretación que este Tribunal ha brindado a dicho precepto y procuró su incorporación en su nueva definición. A tales efectos, la Comisión de lo Jurídico de la Cámara de Representantes dispuso expresamente, en su informe del Proyecto del Senado 2302, que toda la jurisprudencia de asesinato en primer grado por deliberación bajo los Códigos de 1902 y 1974 quedaría incluida dentro de la definición de premeditación adoptada para el Código Penal de 2004. <u>Informe sobre el P. del S. 2302 de la Comisión de lo Jurídico de la Cámara de Representantes de 28 de abril de 2004</u>, 7ma Sesión

---

[8] Nótese que la definición de premeditación permaneció inalterada en el Código Penal de 2012 y la premeditación continúa como un elemento para la primera modalidad de asesinato en primer grado. Véase 33 LPRA sec. 5014(ii) y 33 LPRA sec. 5142(a).

Ordinaria, 14ta Asamblea Legislativa, pág. 21. Por lo tanto, nuestras expresiones con relación a la rapidez con la que se puede alcanzar el estado mental de la premeditación forman parte integral de la definición adoptada en aquel entonces.

Ahora bien, en Pueblo v. Rodríguez Pagán, supra, hicimos hincapié en que la existencia de la premeditación — como elemento mental subjetivo— únicamente podrá ser determinada caso a caso mediante una inferencia de los hechos. Por tanto, la presencia del elemento de la premeditación siempre requerirá evidencia de que el acusado **formó en su mente la determinación de matar, y entonces algún tiempo después, ya sea inmediato o remoto, llevó a cabo su determinación, previamente formada.** Entre los puntos que se tomarán en consideración para determinar si se ha premeditado se encuentran **los actos y las circunstancias que rodean la muerte, la relación entre las partes, la capacidad mental del autor, la motivación, las manifestaciones y la conducta del acusado,** así como los hechos anteriores, concomitantes y posteriores al crimen. Íd., pág. 250.

III.

No encontramos razón para desacatar la apreciación de la prueba que hiciera el Tribunal de Primera Instancia a los efectos de que en este caso los actos que rodean la muerte del menor Eliezer evidencian la premeditación con la que actuó el recurrido, Concepción Guerra. Tras examinar

cuidadosamente la prueba vertida durante el juicio, se desprende que este le manifestó a Machuca Rosario que la muerte del menor Eliezer no había sido un "abuso" —como se comentaba en la cárcel— pues él "tenía una guerra en la calle" con "Bolo" y tenía que defenderse. En ese sentido, sabía que lo buscaban y estaba preparado para repeler cualquier ataque con fuerza letal. Es importante resaltar que el testigo Machuca Rosario declaró que el recurrido, Concepción Guerra, le expresó que su refrán era que si una persona tenía una guerra con él en la calle y él se la encontraba acompañada de su familia, si la persona no le había hecho daño él la perdonaba, de lo contrario, "**pues, se muere to[do] el mundo**". Transcripción de la Prueba, 4ta Transcripción, Piezas 1-2, pág. 124.

Si analizamos las manifestaciones, los actos, la motivación y la conducta del recurrido, Concepción Guerra, podemos concluir sin lugar a dudas que este concibió y sopesó las alternativas disponibles para hacer frente a la presencia de sus "enemigos". Mientras el recurrido, Concepción Guerra, se encontraba "endecando" droga escuchó ciertos ruidos en la parte trasera de la casa y creyó que se trataba de sus "enemigos". Por consiguiente, tomó la decisión de detener lo que hacía y dirigirse a esa parte de la propiedad con un arma de fuego para fulminar la vida de estos. De esta forma, al salir de la casa y escuchar las palabras "cógelo, cógelo", el recurrido, Concepción Guerra, ejecutó el acto ilegal que había anticipado y disparó el

arma de fuego. Entre un espectro de posibilidades —como lo hubiera sido, por ejemplo, huir de la propiedad donde se encontraba o esconderse en algún lugar— el recurrido, Concepción Guerra, ya había escogido la opción de asesinar a los posibles integrantes del grupo criminal de "Bolo". Había decidido de antemano matar a quien se acercara a la residencia. Iba a disparar sin preguntar, ni indagar quién era. Así, con la idea preconcebida de actuar de determinada forma, dejó de "trabajar" con la droga que empacaba y se dirigió hasta la parte trasera de la propiedad que ocupaba con un arma y al salir, abrió fuego contra el menor Eliezer.

En conclusión, el resultado delictivo suscitado en el presente caso, como consecuencia de la guerra librada entre traficantes de sustancias controladas, demuestra que Concepción Guerra había preconcebido y seleccionado el asesinato como la opción para lidiar con sus "enemigos" en la guerra callejera. Estamos ante un asesinato premeditado, no frente a uno cometido bajo el impulso del momento. Por eso, el Tribunal de Apelaciones erró al modificar la sentencia del Tribunal de Primera Instancia para reducir la condena del recurrido, Concepción Guerra, a asesinato en segundo grado.

IV.

Pasamos ahora a considerar si al amparo del Art. 7.03 de la Ley de Armas, _supra_, la pena que se puede duplicar, de encontrarse probada alguna circunstancia agravante allí

establecida, es la pena fija establecida para el delito o la pena aumentada o reducida luego de probarse algún agravante o atenuante contemplado en el mismo artículo.

La Ley Núm. 404-2000, mejor conocida como la Ley de Armas, 25 LPRA sec. 455 et seq., fue aprobada con el propósito principal de lograr una solución efectiva al problema del control de armas de fuego en manos de delincuentes en Puerto Rico, el cual constituye una "vertiente directa de la actividad criminal". Exposición de Motivos de la Ley Núm. 404 de 11 de septiembre de 2000. Según dispuso expresamente el legislador, "[e]stas armas son utilizadas durante la comisión de todo tipo de actos criminales, situación que hace necesario adoptar medidas legislativas cuya naturaleza sancionadora constituya un eficaz disuasivo al delincuente". Íd. A tales efectos, ese estatuto orienta a las personas autorizadas en Puerto Rico a manejar armas de fuego para que lo hagan responsablemente y, a su vez, apercibe al delincuente de las serias consecuencias de incurrir en actos criminales al utilizar armas de fuego. Cancio, Ex Parte, 161 DPR 479, 484 (2004).

Enmarcado dentro del mencionado propósito legislativo, el Art. 5.04 de la Ley de Armas, 25 LPRA sec. 458c, dispone, en lo aquí pertinente, que toda persona que transporte o porte cualquier arma de fuego sin tener la correspondiente licencia o permiso de portación de armas incurrirá en un delito grave y de resultar convicta será sancionada con una pena de reclusión por un término fijo de

diez años. Además, el artículo contempla la variación del término de esta pena fija establecida entre un intervalo de un mínimo de cinco años y un máximo de veinte años de mediar circunstancias atenuantes o agravantes.

Por otra parte, el Art. 5.15 del mismo estatuto, 25 LPRA sec. 458n, regula la conducta proscrita con relación a apuntar o disparar un arma. Este artículo establece que incurrirá en un delito grave, con pena de reclusión de un término fijo de cinco años, toda persona que voluntariamente dispare cualquier arma en un lugar público, o en cualquier otro sitio donde haya alguna persona que pueda sufrir daño, o que intencionalmente, aunque sin malicia, apunte hacia alguna persona con un arma, aunque no le cause daño a la persona. Igualmente, este artículo autoriza la posibilidad de aumentar hasta un máximo de diez años o reducir hasta un mínimo de un año la pena fija establecida de mediar circunstancias agravantes o atenuantes. De manera que se estatuyó que las penas fijas establecidas para las infracciones de los Arts. 5.04 y 5.15, _supra_, —de diez y cinco años de reclusión, respectivamente— podrían ser variadas con la existencia de agravantes o atenuantes.

Posterior a la entrada en vigor de la Ley de Armas, _supra_, surgió la necesidad de reevaluar su contenido para atemperarlo a las exigencias de nuestra sociedad. Exposición de Motivos de la Ley Núm. 137 de 3 de junio de 2004. Con ese fin, la Asamblea Legislativa aprobó la Ley

Núm. 137-2004 para "fortalecer las herramientas al alcance del sistema judicial y corregir lagunas existentes para penalizar severamente al delincuente que hace mal uso de la licencia de armas y sus permisos así como el uso de armas y municiones ilegales". Íd., pág. 2. Fue al amparo de esta legislación que se enmendó el Art. 7.03 de la Ley de Armas, 25 LPRA sec. 460b, para permitir, entre otras cosas, que la pena dispuesta para el delito imputado pueda ser duplicada si la persona acusada ha sido condenada anteriormente por cualquier violación a dicha ley. De conformidad con las observaciones de la Comisión de lo Jurídico de la Cámara de Representantes, el Art. 7.03, supra, se enmendó para disponer que la pena se duplicara en casos de reincidentes y cuando existan daños a terceros por el uso ilegal de un arma. Informe sobre P. de la C. 4641 de la Comisión de lo Jurídico de la Cámara de Representantes de 24 de mayo de 2004, 7ma Sesión Ordinaria, 14ta Asamblea Legislativa, pág. 10.

En lo que respecta al asunto específico ante nuestra consideración, el recurrido, Concepción Guerra, fue acusado y sentenciado por violaciones de los Arts. 5.04 y 5.15, con sus correspondientes agravantes. El foro primario impuso sobre el recurrido, Concepción Guerra, las penas fijas establecidas de cinco y diez años por infracciones de los Arts. 5.04 y 5.15 de la Ley de Armas, supra, respectivamente. Después las aumentó hasta el máximo permitido de diez y veinte años al aceptar los agravantes

presentados por el Ministerio Público. Además, al aplicar el agravante adicional del Art. 7.03, supra, duplicó las penas agravadas para un total de veinte y cuarenta años por cada violación. La suficiencia de la prueba para tales condenas fue validada por el Tribunal de Apelaciones y no se recurrió de esa determinación ante este Tribunal.

No obstante, el foro apelativo intermedio concluyó que el Tribunal de Primera Instancia erró al aumentar, en presencia de agravantes, las penas fijas establecidas para los Arts. 5.04 y 5.15 de la Ley de Armas, supra, y una vez aumentadas, aplicar el agravante independiente del Art. 7.03, supra, para duplicar las penas aumentadas previamente. El Tribunal de Apelaciones razonó que este artículo permite únicamente la duplicación de la pena fija establecida para los delitos sin mediar aumento por agravantes. Por consiguiente, modificó la sentencia del foro primario para que la pena de reclusión por infringir el Art. 5.04, supra, correspondiera a la duplicación de la pena fija establecida de diez años para un total de veinte años. Mientras, fijó la pena de reclusión por violar el Art. 5.15, supra, en diez años, correspondientes al doble de la pena fija establecida de cinco años.

Sin embargo, no encontramos apoyo legal alguno que sustente la interpretación brindada por el foro apelativo intermedio. Por el contrario, el tracto legislativo de la referida ley avala la aplicación dada por el Tribunal de Primera Instancia en el presente caso.

La Ley de Armas, desde su redacción original, tipificó los delitos de los Arts. 5.04 y 5.15, <u>supra</u>,[9] con sus correspondientes agravantes y atenuantes. A partir de ese momento, dicho cuerpo normativo sufrió enmiendas con la intención legislativa expresa de "penalizar severamente al delincuente". En aras de articular esta política pública, la Ley Núm. 137-2004 incorporó el Art. 7.03, <u>supra</u>, para añadir de manera específica que en casos de reincidentes, entre otros, las penas pueden duplicarse. Lo anterior nos lleva a concluir que el legislador quiso imponer la penalidad que se provee en el Art. 7.03, <u>supra</u>, sobre cada delito individual, agravado o atenuado, pues estos estaban contemplados al momento de incorporarse el mencionado artículo mediante enmienda a la ley.

El razonamiento del foro apelativo intermedio a los efectos de que el Art. 7.03, <u>supra</u>, permite únicamente duplicar las penas fijas establecidas para los distintos delitos tipificados, no tendría cabida en instancias donde la pena fija establecida fuese reducida por la presencia de atenuantes. En esa situación, aunque se pruebe algún atenuante de los delitos imputados, el foro sentenciador tendría que eliminar su efecto sobre la pena resultante, pues solo podría duplicar las penas fijas establecidas. Se anularían *de facto* los atenuantes, con la consecuencia de privar al acusado de su derecho estatutario a la reducción

---

[9] Bajo la Ley Núm. 404-2000 esos artículos estaban enumerados como 4.04 y 4.15.

de la pena fija establecida por la existencia de atenuantes.

En vista de lo anterior, resolvemos que bajo el Art. 7.03 de la Ley de Armas, supra, la pena que dicho precepto autoriza duplicar es la pena dispuesta para el delito imputado una vez contemplados los posibles agravantes y atenuantes. Ahora bien, en ausencia de estos agravantes o atenuantes la duplicación se rige por la pena fija establecida. Este dictamen es cónsono con la intención legislativa que precede la aprobación y posterior enmienda de la Ley de Armas. En vista de lo anterior, erró el Tribunal de Apelaciones en su análisis de las disposiciones legales en juego en este caso.

## V.

Por las razones expuestas, se revoca la sentencia del Tribunal de Apelaciones y se reestablece el fallo de culpabilidad emitido por el Tribunal de Primera Instancia de asesinato en primer grado y por violaciones de la Ley de Armas con sus correspondientes agravantes.

Se dictará Sentencia de conformidad.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

      v.                           CC-2014-0818

José A. Concepción Guerra

    Recurrido

SENTENCIA

En San Juan, Puerto Rico, a 10 de diciembre de 2015.

Por los fundamentos antes expuestos, en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se revoca la sentencia del Tribunal de Apelaciones y se reestablece el fallo de culpabilidad emitido por el Tribunal de Primera Instancia de asesinato en primer grado y por violaciones de la Ley de Armas con sus correspondientes agravantes.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal Supremo.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo