Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| | | |
|---|---|---|
| **EL PUEBLO DE PUERTO RICO**<br><br>Apelado<br><br>v.<br><br>**STEVEN GUTIERREZ RIVERA**<br><br>Apelante | KLAN202300506 | **APELACION**<br>Procedente del Tribunal de Primera Instancia, Sala Superior de Humacao<br><br>Caso Núm.:<br>**HSCR202200481-0485**<br><br>Sobre: Art. 95 Asesinato Atenuado |

Panel integrado por su presidenta la Juez Brignoni Mártir, el Juez Candelaria Rosa y el Juez Pérez Ocasio

Pérez Ocasio, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 25 de noviembre de 2024.

Comparece ante nos, Steven Gutiérrez Rivera, en adelante, Gutiérrez Rivera o apelante, solicitando que revisemos la *"Sentencia"* del Tribunal de Primera Instancia, Sala de Humacao, en adelante, TPI- Humacao, del 10 de mayo de 2023. En el dictamen referido, el apelante fue encontrado culpable por varios delitos.

Por los fundamentos que expondremos a continuación, *confirmamos la sentencia apelada.*

**I.**

Por eventos acaecidos el 28 de julio de 2022, que culminaron en la muerte de Arturo Claudio López, se radicaron cuatro denuncias en ausencia en contra de Gutiérrez Rivera.[2] El apelante enfrentó un (1) cargo por violación al Artículo 93(a) del Código

---

[1] Véase Orden Administrativa OATA-2023-131 del 14 de julio de 2023, donde se designa al Juez Alberto Luis Pérez Ocasio en sustitución de la Jueza Laura I. Ortiz Flores.
[2] Los hechos esbozados en la primera parte de esta sentencia son extraídos de los autos originales que obran en nuestro expediente, los cuales recibimos el día 24 de octubre de 2024.

Penal;[3] un (1) cargo por violación al Artículo 6.14(a) de la Ley de Armas;[4] un (1) cargo por violación al Artículo 6.14(b) de la Ley de Armas;[5] y un (1) cargo por violación al Artículo 249(c) del Código Penal.[6]

Según surge de los autos originales que obran en el expediente, una vez se determinó causa probable para arresto en ausencia del apelante, este fue arrestado con una fianza de $750,000.00, el 1 de agosto de 2022. A pesar de ser considerado indigente, la Sociedad de Asistencia Legal (SAL) no asumió su representación legal por conflicto de intereses. Así las cosas, el TPI-Humacao designó al Lcdo. Eduardo Ortiz Declet, como abogado de oficio, para que representara al apelante durante el proceso judicial. Luego de varios trámites procesales, el 21 de octubre de 2022, fue celebrada la vista preliminar y se determinó causa probable para acusar al apelante.

Tras haber renunciado a su derecho constitucional a juicio por jurado, se celebró el juicio por tribunal de derecho. El juicio contra Gutiérrez Rivera fue celebrado entre los días 23 de enero de 2023 al 10 de marzo de 2023.[7] A continuación, ofrecemos un resumen de los testimonios vertidos en el juicio que nos ocupa, y que hemos examinado con detenimiento.

- **Ricardo Tirado Gordon**

El testigo vive en Villa Universitaria en el Municipio de Humacao, en donde ocurrieron los hechos del caso de autos, e indicó conocer a la víctima del caso de marras, ya que eran vecinos.[8] En su testimonio, declaró que luego de trabajar se fue a pescar, y quedó

---

[3] Artículo 93(a) del Código Penal de Puerto Rico, Ley 146-2012, 33 LPRA sec. 5142.
[4] Artículo 6.14(a) de la Ley de Armas de Puerto Rico de 2020, 25 LPRA sec. 466m.
[5] Artículo 6.14(b) de la Ley de Armas de Puerto Rico de 2020, supra.
[6] Artículo 249(c) del Código Penal de Puerto Rico, supra, sec. 5339.
[7] Transcripción de la prueba oral estipulada.
[8] *Id.*, pág. 51.

en verse con el occiso luego de que terminara, allá en Villa Universitaria.[9]

Estando de regreso el día de los hechos a Villa Universitaria, Tirado Gordon se dirigió a un parque ubicado en la mencionada urbanización, tomando asiento en unos bancos, en compañía de su hija Yanli y el apelante.[10] Indicó que Gutiérrez Rivera no se encontraba bien, pues atravesaba unos asuntos personales difíciles, y de los cuales se encontraban hablando el día de los hechos.[11]

Según su testimonio, poco tiempo después, llegó el occiso al área junto a una amiga, estacionó su vehículo y se dirigió hacia el testigo, la hija de este último y el apelante.[12] Indicó que este último lo saludó, y que al momento de dirigirse al apelante para el saludo, este le expresó que no interesaba su saludo, con visible molestia y haciendo uso de palabras soeces.[13] Según Tirado Gordon, el occiso también se alteró, y se suscitó una discusión entre ambos.[14] El testigo explicó que tuvo que intervenir físicamente con Gutiérrez Rivera, para evitar mayores consecuencias.[15]

Unos instantes luego, el apelante, haciendo uso de un arma de fuego, le dispara a la víctima en cinco (5) ocasiones. Indicó, que el arma utilizada era un revolver "aniquelao".[16] Explicó, también, que luego de darle muerte a la víctima, el apelante apuntó el arma de fuego hacia el testigo, y le instruyó no decir su nombre.[17]

Posterior a los hechos, Tirado Gordon indicó que llamó a las autoridades.[18] Añadió que fue entrevistado por el Agente José

---

[9] Transcripción de la prueba oral, págs. 51-52.
[10] *Id.*, págs. 52-53.
[11] *Id.*, pág. 55.
[12] *Id.*, pág. 56.
[13] *Id.*
[14] *Id.*, págs. 56-58.
[15] *Id.*, pág. 59.
[16] *Id.*, pág. 61.
[17] *Id.*
[18] *Id.*, pág. 62.

Caraballo de la División de Homicidios en el Cuerpo de Investigaciones Criminales (CIC) de Humacao, a quien describió.[19]

Durante su testimonio, Tirado Gordon identificó en fotos la escena y al occiso.[20]

Por otro lado, durante el contrainterrogatorio de la defensa, el testigo indicó que, aunque no lo dijo en su testimonio ni en su declaración jurada, las pertenencias del occiso fueron robadas.[21] También, añadió que hizo una segunda llamada al 9-1-1, en la que indicó que no sabía quién le había disparado a la víctima.[22]

- **Agente José Caraballo Medina de la División de Homicidios del CIC Humacao**

El Agente Caraballo testificó ser miembro de la Policía de Puerto Rico hace veintiún (21) años, y labora actualmente en la División de Homicidios del CIC de Humacao.[23] El testigo indicó que el día de los hechos que ocupan este caso se encontraba en turno, cuando recibió una llamada sobre un asesinato en Villa Universitaria en el Municipio de Humacao.[24] Indicó que, al llegar a la misma, ya se encontraban unos agentes de la policía en la escena.[25] Además, indicó que vio el cuerpo del occiso, y lo reconoció mediante fotos durante el juicio.[26]

El Agente Caraballo testificó que tomó notas, mientras se encontraba en la escena del crimen.[27] En sus notas, alegó incluir lo recogido en la entrevista que le realizó a Tirado Gordon.[28] Indicó, además, que posterior a las notas, realizó un bosquejo de la escena preliminar y la información que recopiló del testigo mencionado.[29]

---

[19] Transcripción de la prueba oral, pág. 66.
[20] *Id.*, pág. 62.
[21] *Id.*, pág. 80.
[22] *Id.*, pág. 87.
[23] *Id.*, pág. 122.
[24] *Id.*, pág. 124.
[25] *Id.*, pág. 125.
[26] *Id.*, pág. 126.
[27] *Id.*, pág. 127.
[28] *Id.*, pág. 129.
[29] *Id.*, pág. 127.

De la entrevista realizada a Tirado Gordon, el Agente Caraballo hizo un resumen, en el que ratificó lo esbozado durante el juicio por el testigo ocular en cuestión.[30] Más adelante añadió que citó a Tirado Gordon a la División de Homicidios del CIC de Humacao, en donde se le tomó una declaración jurada.[31]

Durante su testimonio, el agente puso a disposición de la defensa unos documentos o notas que no le había entregado durante el proceso de descubrimiento de prueba.[32] Ante el planteamiento del Ministerio Público, mediante el cual indicó haber tomado conocimiento de esos documentos durante ese testimonio, el TPI-Humacao, a requerimiento de la defensa, ordenó la entrega de estos; concedió un término razonable para que la defensa examinara y discutiera los mismos con el apelante, y reséñalo la continuación del juicio para una fecha posterior, luego de contar con la anuencia de la defensa y el Ministerio Público.[33]

Según los documentos que obran en autos, una vez finalizado los testimonios de ambos testigos, y de la prueba documental presentada y admitida, el apelante fue declarado culpable y convicto por el delito de asesinato atenuado;[34] riesgo a la seguridad u orden público al disparar un arma de fuego en un sitio público o abierto al público;[35] disparar o apuntar un arma de fuego;[36] y se le agravaron las penas bajo la Ley de Armas de Puerto Rico de 2020.[37] La *"Sentencia"* en contra de Gutiérrez Rivera recayó el 10 de mayo de 2023.

Inconforme con el resultado, el 9 de junio de 2023, el apelante presentó ante esta Curia un *"Escrito de Apelación"*. Además,

---

[30] Transcripción de la prueba oral, págs. 129-131.
[31] *Id.*, pág. 134.
[32] *Id.*, págs. 138-139, 141.
[33] *Id.*, págs. 148-151.
[34] Artículo 95 del Código Penal de Puerto Rico, supra, sec. 5144.
[35] Artículo 249(c), del Código Penal de Puerto Rico, supra, sec. 5339.
[36] Artículo 6.14 de la Ley de Armas de Puerto Rico de 2020, supra, sec. 466m.
[37] Artículo 6.01 de la Ley de Armas de Puerto Rico de 2020, supra, sec. 466.

presentó una *"Moción Solicitando Relevo de Representación Legal"*. Amparándose en el Canon 21 de Ética Profesional, el Lcdo. Eduardo Ortiz Declet alegó que existían diferencias insubsanables y que la confianza en la relación abogado-cliente había sido lacerada.

El 28 de junio de 2023, emitimos una *"Resolución"* en la que referimos la solicitud de relevo de representación legal a la Jueza Administradora del TPI-Humacao, para que designara un nuevo abogado de oficio que representara a Gutiérrez Rivera en los procesos apelativos.

El 18 de agosto de 2023, mediante *"Resolución"*, ordenamos al TPI-Humacao a informar en un término de treinta (30) días el estatus de la designación de abogado de oficio para el apelante. Así las cosas, el 12 de septiembre de 2023, la Lcda. Elba Villalba Ojeda radicó una moción informativa ante este Tribunal, en la que anunció su designación como abogada de oficio en el caso de epígrafe. Además, indicó haber recibido el expediente del caso el 7 de septiembre de 2023. Sin embargo, informó que no había podido reunirse con Gutiérrez Rivera, por razón de dos (2) traslados de institución.

Mediante *"Resolución"* del 13 de septiembre de 2023, ordenamos a la Secretaría Regional del TPI-Humacao la regrabación del juicio del caso de marras, y remitiera el mismo en un término de diez (10) días a la Secretaría del Tribunal de Apelaciones. Ordenamos, también, a nuestra Secretaría a transcribir la prueba oral, una vez recibida. Por otro lado, establecimos los términos a seguir, en el proceso apelativo criminal de autos, y advertimos que *"transcurridos los términos aquí dispuestos, el caso se entenderá perfeccionado para la consideración de este Tribunal"*.

El 17 de enero de 2024, recibimos la transcripción del caso solicitada. Por ello, mediante *"Resolución"* del 18 de enero de 2024,

ordenamos a las partes a cumplir con los términos dispuestos en la *"Resolución"* del 13 de septiembre de 2023.

Luego de varios trámites procesales, el 20 de mayo de 2024, la representación legal de Gutiérrez Rivera radicó una moción urgente, en la que solicitó sesenta (60) días para presentar el alegato. Mediante *"Resolución"* del 21 de mayo de 2024, concedimos al apelante un *término final* de cuarenta y cinco (45) días para cumplir. Sin embargo, el 9 de julio de 2024, la representación legal del apelante presentó una moción ante nos, en la que ofreció varias excusas por las que no había podido cumplir con el término concedido, y solicitó catorce (14) días adicionales. Esas dos (2) semanas transcurrieron, y Gutiérrez Rivera nunca presentó su alegato. Por ello, consideramos el recurso ante nos perfeccionado y procedimos a expresarnos. En síntesis, mediante *Sentencia* emitida el 30 de agosto de 2024, desestimamos el "*Recurso de Apelación*" por falta de jurisdicción al no perfeccionarse el recurso.

Así las cosas, el apelante presentó un escrito *"De Reconsideración y en Solicitud"* solicitando la reconsideración de la desestimación del recurso apelativo. Esta Curia acogió dicho escrito el 25 de septiembre de 2024, y dejó sin efecto la *Sentencia,* mediante la cual se desestimó la apelación de Gutiérrez Rivera. Le concedimos al apelante un término final e improrrogable, a vencer el 14 de octubre de 2024, para presentar su alegato, luego de la consignación de una sanción económica de $250.00, a ser pagados dentro del término de quince (15) días.

Tras varios trámites procesales, el 13 de octubre de 2024, el apelante presentó su alegato, en el que señaló los siguientes errores:

> **PRIMER ERROR:** ERRÓ EL HONORABLE TRIBUNAL AL DECLARAR CULPABLE Y CONVICTO AL ACUSADO POR INFRACCIÓN AL ART. 95 DEL CÓDIGO PENAL (2012) A BASE DE UNA PRUEBA INSUFICIENTE EN DERECHO AL

NO HABERSE PROBADO LA COMISIÓN DEL DELITO MÁS ALLÁ DE DUDA RAZONABLE.

**SEGUNDO ERROR:** ERRÓ EL HONORABLE TRIBUNAL AL DECLARAR CULPABLE Y CONVICTO AL ACUSADO POR DOS INFRACCIONES AL ART. 249 (C) DEL CÓDIGO PENAL (2012) A BASE DE UNA PRUEBA INSUFICIENTE EN DERECHO AL NO HABERSE PROBADO LA COMISIÓN DEL DELITO MÁS ALLÁ DE DUDA RAZONABLE.

**TERCER ERROR:** ERRÓ EL HONORABLE TRIBUNAL AL DECLARAR CULPABLE Y CONVICTO AL ACUSADO POR INFRACCIONES AL ART. 6.14 (A) Y ART. 6.14 (B) DE LA LEY DE ARMAS DE 2020 A BASE DE UNA PRUEBA INSUFICIENTE EN DERECHO AL NO HABERSE PROBADO LA COMISIÓN DEL DELITO MÁS ALLÁ DE DUDA RAZONABLE.

**CUARTO ERROR:** ERRÓ EL HONORABLE TRIBUNAL AL APLICAR EL AGRAVAMIENTO DE LA PENA CONTENIDO EN EL ART. 6.01(A) DE LA LEY DE ARMAS DE 2020 Y, DE ESTA FORMA, DUPLICAR DE 5 A 10 AÑOS LA PENA EN EL CASO HSCR202200484.

Con el beneficio de la comparecencia y los escritos de ambas partes, la evaluación de los autos originales, y la transcripción del juicio en su fondo, nos encontramos en posición para atender el recurso. A continuación, esbozaremos la normativa y el estado de derecho que enmarca la controversia que aquí nos ocupa.

## II.

### A. Apelación Criminal

Como es sabido, las Reglas 193 y 194 de Procedimiento Criminal, 34 LPRA Ap. II, R. 193 y 194, disponen que una apelación criminal se formalizará con la presentación de un escrito ante un foro de mayor jerarquía. *Pueblo v. Arlequín Vélez*, 194 DPR 871, 876 (2016); *Pueblo v. Rodríguez Meléndez*, 150 DPR 519, 522 (2000).

Este derecho, tanto en Puerto Rico como en la jurisdicción federal, *es uno de carácter estatutario, no constitucional.* No importa la gravedad de la ofensa, un acusado convicto no tiene un derecho

constitucional a apelar su convicción. *Pueblo v. Valentín Rivera,* 197 DPR 636, 638 (2017); *Pueblo v. Esquilín Díaz,* 146 DPR 808, 814 (1998).

A diferencia de los recursos de *certiorari,* las apelaciones proceden como cuestión de derecho, por lo que este Tribunal viene obligado a considerar sus méritos, a menos que carezca de jurisdicción o que la parte promovente incurra en craso incumplimiento con la ley y con las reglas que regulan su perfeccionamiento, falta de diligencia o frivolidad. *Feliberty v. Sociedad de Gananciales,* 147 DPR 834, 837-838 (1999). De manera reiterada, nuestro Tribunal Supremo ha afirmado que la determinación de si se probó, o no, la culpabilidad del acusado a la luz de la referida carga probatoria es revisable en apelación, ello dado a que la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y derecho. *Pueblo v. Negrón Ramírez,* 2024 TSPR 41, 213 DPR ___ (2024); *Pueblo v. Irizarry,* 156 DPR 780, 788 (2002).

Ahora bien, el derecho a la revisión judicial por un tribunal de mayor jerarquía no es infalible ni automático, sino que requiere que los recursos sean perfeccionados en la forma y términos provistos para ello. *UGT v. Centro Médico del Turabo,* 208 DPR 944, 957 (2022); *Gran Vista I v. Gutiérrez y otros,* 170 DPR 174, 185 (2007). Por eso, las normas que rigen el perfeccionamiento de los recursos apelativos deben ser acatadas por los promoventes de manera rigurosa y responsable. *UGT v. Centro Médico del Turabo,* supra, pág. 957; *Isleta v. Inversiones Isleta Marina,* 203 DPR 585, 590 (2019); *Soto Pino v. Uno Radio Group,* 189 DPR 84, 90 (2013); *DACo v. Servidores Públicos Unidos,* 187 DPR 704, 707 (2013).

A esos efectos, nuestro Alto Foro ha expresado que "[t]odo abogado tiene la obligación y el deber de cumplir a cabalidad y con rigurosidad con los requisitos dispuestos en las leyes y en los

reglamentos respecto el perfeccionamiento de los recursos apelativos presentados". *Morán v. Martí*, 165 DPR 356, 363 (2005). También ha expresado que los abogados deben "demostrar celo, cuidado y diligencia en la tramitación de todos los asuntos judiciales". *Pellot v. Avon*, 160 DPR 125, 134 (2003). Nuestro ordenamiento jurídico no permite que los abogados decidan cuales disposiciones reglamentarias son acatadas, y de qué manera lo son. *Matos v. Metropolitan Marble Corp.*, 104 DPR 122, 125 (1975).

### B. Apreciación de la Prueba

Cuando un acusado es encontrado culpable más allá de toda duda razonable, tiene el derecho a apelar su sentencia, como cuestión de derecho. Ahora bien, la apreciación de la prueba desfilada es un asunto tanto de hecho como de derecho. *Pueblo v. Negrón Ramírez,* supra; *Pueblo v. Irizarry*, supra, pág. 788. Además, como regla general, los foros apelativos no estamos en posición para sustituir determinaciones del tribunal de primera instancia con nuestras propias apreciaciones. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013); *Serrano Muñoz v. Auxilio Mutuo,* 171 DPR 717, 741 (2007). En consecución, este Tribunal no debe intervenir indebidamente con las determinaciones de la prueba y la credibilidad otorgada a los testigos. *Pueblo v. Negrón Ramírez,* supra; *Pueblo v. Toro Martínez*, 200 DPR 834, 858 (2018).

Es un principio cardinal en el ámbito jurídico penal, que, al revisar cuestiones relativas a convicciones criminales, la apreciación de la prueba le corresponde, en primera instancia, al foro sentenciador. *Pueblo v. Santiago et al.,* 176 DPR 133, 147-148 (2009). Bien analiza esta máxima nuestro Tribunal Supremo al expresar que "el foro primario cuenta solamente con récords mudos e inexpresivos". *Trinidad v. Chade*, 153 DPR 280, 291 (2001). Véase,

además, *SLG Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 356 (2009). Tal deferencia se fundamenta en que:

> [E]s el juez sentenciador, ante quien deponen los testigos, quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manierismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad.
>
> *Pueblo v. García Colón I*, 182 DPR 129, 165 (2011), citando a *Argüello v. Argüello*, 155 DPR 62, 78 (2001).

Por otro lado, en un caso más antiguo, nuestro Alto Foro hizo unas expresiones más vívidas e ilustrativas sobre el espíritu detrás de la deferencia concedida a la ventaja física que ostenta el Foro Primario en su apreciación de la prueba:

> [N]o sólo habla la voz viva. También hablan las expresiones mímicas: ***el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo***, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, ***todos estos elementos se pierden en la letra muda de las actas***, por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el ***instrumento más útil*** para la investigación de la verdad: ***la observación***.
>
> *Ortiz v. Cruz Pabón*, 103 DPR 939, 947 (1975).
> (Énfasis nuestro).

Por tanto, "[a]l evaluar si se probó la culpabilidad de un acusado más allá de duda razonable, los foros apelativos no debemos hacer abstracción de la ineludible realidad de que los jueces del tribunal de primera instancia y los jurados están en mejor posición de apreciar y aquilatar la prueba y los testimonios presentados". *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Casillas, Torres*, 190 DPR 398, 416 (2014). Véase, además, *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

Ahora bien, esta norma no es absoluta ni está huérfana de excepción. Una sentencia de culpabilidad debe ser revocada, si se demuestra que hubo pasión, perjuicio, parcialidad o error manifiesto en la evaluación de la prueba realizada por el juzgador de los hechos. Además, si luego del análisis de los casos ante nos, encontramos que la prueba no justifica el resultado, o que la prueba no concuerda con la realidad fáctica, por ser esta increíble o imposible, procede nuestra intervención y posible revocación. *Pueblo v. Casillas, Torres*, supra, *Pueblo v. Santiago et al.*, supra, pág. 148.

Cabe señalar que, "el marco de acción limitado, a nivel apelativo, con respecto a la apreciación de la prueba, no implica que el foro recurrido sea inmune a error; tampoco que, so color de deferencia [...], haremos caso omiso a los errores que se hayan cometido en el foro de instancia". *Pueblo v. Acevedo Estrada*, supra, pág. 100. De manera que el tribunal revisor revocará un fallo inculpatorio cuando el resultado de ese análisis deje serias dudas, razonables y fundadas, sobre la culpabilidad del acusado". *Pueblo v. Santiago et al.*, supra, pág. 148.

Después de todo, los tribunales apelativos, al igual que el tribunal sentenciador, tienen el derecho y el deber de "tener la conciencia tranquila y libre de preocupación". *Pueblo v. Irizarry*, supra, pág. 790; *Pueblo v. Acevedo Estrada*, supra, pág. 100. Un Tribunal revisor puede intervenir en la apreciación de un juzgador que culmine en un fallo condenatorio, cuando una evaluación de la prueba produzca "serias dudas, razonables y fundadas, sobre la culpabilidad del acusado." *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 551 (1974).

A esto añadimos que, tanto nuestro Tribunal Supremo, como el marco normativo sobre el derecho probatorio, han reconocido que un hecho puede ser establecido con solo el testimonio de una persona. *Pueblo v. Rodríguez Román*, 128 DPR 121, 128 (1991). Así

también, la Regla 110 (D) de las Reglas de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 110, establece que "[l]a evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley". A su vez, debemos recordar que no existe el testimonio "perfecto". A los fines de la argumentación, debe mantenerse presente que "cuando un testigo se contradice, lo que se pone en juego es su credibilidad" y que es "al jurado o al juez de instancia a quien le corresponde resolver el valor de su restante testimonio". *Pueblo* v. *Cabán Torres*, 117 DPR 641, 656-657 (1986); *Pueblo* v. *Cruz Negrón*, 104 DPR 881, 883 (1976).

Por tanto, las determinaciones del juzgador de los hechos no deben ser descartadas arbitrariamente ni deben sustituirse por otro criterio a menos que de la prueba admitida surja que no existe base suficiente para apoyarlas. *Pueblo v. Maisonave Rodríguez,* 129 DPR 49, 62 (1991). Es decir, solo debemos apartarnos de esta deferencia cuando la apreciación de la prueba se alejó demasiado de la prueba presentada o cuando la realidad no concuerda con la evidencia sometida durante el juicio, o ésta resultare increíble o imposible. *Pueblo v. Acevedo Estrada,* supra, págs. 98-99.

### C. Quantum probatorio: más allá de duda razonable

La Constitución del Estado Libre Asociado de Puerto Rico consagra en su Artículo II, Sección 11, la presunción de inocencia a todo individuo que esté acusado de un delito. Por ello, el Estado viene obligado a rebatir la presunción, y establecer su culpabilidad. *Pueblo v. Irizarry,* supra, pág. 786-787; *Pueblo v. González Román,* 138 DPR 691, 707 (1995); *Pueblo v. Rosaly Soto,* 128 DPR 729, 739 (1991); Regla 110 de las Reglas de Procedimiento Criminal, 34 LPRA Ap. II, R. 110.

Esta responsabilidad del Estado debe consumarse dentro del estándar evidenciario de ***más allá de duda razonable.*** Los elementos del delito imputado, así como la conexión del acusado con los hechos delictivos deben establecerse para cumplir con este quantum probatorio. *Pueblo v. Nieves Cabán*, 201 DPR 853, 878 (2019); *Pueblo v. Santiago et al.*, supra, pág. 142; *Pueblo v. Irizarry*, *supra*, pág. 787; *Pueblo v. Acevedo Estrada*, supra, pág. 99. Aclaramos que lo previo no implica que deba destruirse toda duda posible, sea especulativa o imaginaria, ni que la culpabilidad del acusado tenga que establecerse con certeza matemática. *Pueblo v. Feliciano*, 150 DPR 443, 447 (2000); *Pueblo v. Rosario Reyes,* 138 DPR 591, 598 (1995); *Pueblo v. Pagán, Ortiz,* 130 DPR 470, 480 (1992); *Pueblo v. Bigío Pastrana,* 116 DPR 748, 761 (1985).

En resumidas cuentas, la duda razonable es aquella duda fundada que surge como producto de la consideración justa e imparcial de la totalidad de la evidencia o de la falta de prueba suficiente, por lo que "[n]o es una duda especulativa, imaginaria o cualquier duda posible". *Pueblo v. Cruz Granados*, 116 DPR 3, 21 (1984). "[T]enemos que concluir que el concepto de duda razonable tiene una similitud con el amor: es un tanto difícil de definir y describir pero podemos reconocerlo cuando está frente a nosotros". *Pueblo v. Soto Gonzalez,* 149 DPR 30, 43 (1999).

### D. Asesinato Atenuado

El Artículo 92 del Código Penal, supra, sec. 5141, define el asesinato como dar muerte a un ser humano a propósito, con conocimiento o temerariamente. Estos últimos, conocidos como los elementos subjetivos del delito, están definidos por el Artículo 22 del referido Código, supra, sec. 5035. La Ley 246-2014 enmendó el precitado Artículo para adoptar la Sección 2.02 del Código Penal Modelo, Am. Law Inst. (1962), el cual especifica que una persona

actúa "a propósito" cuando su objetivo consciente es la producción de dicho resultado. *Pueblo v. Carrillo*, 207 DPR 1056, 1068 (2021). De otra parte, establece que una persona actúa "con conocimiento" cuando es consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta. *Íd.*

De otra parte, en su Artículo 95, el Código Penal, supra, sec. 5144, tipifica la modalidad de *asesinato atenuado* y lo define como:

> Toda muerte causada a propósito, con conocimiento o temerariamente, que se produce como consecuencia de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia, será sancionada con pena de reclusión por un término fijo de quince (15) años.

Por tratarse de un asesinato, los elementos del asesinato atenuado son dar muerte a un ser humano a propósito, con conocimiento o temerariamente, pero, a diferencia del asesinato en primer grado, la pena se amortigua considerando que la muerte es consecuencia de una súbita pendencia, o de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable. *Pueblo v. Guadalupe Rivera*, 206 DPR 616, 633 (2021); D. Nevárez-Muñiz, *Código Penal de Puerto Rico*, San Juan, Instituto para el Desarrollo del Derecho, Inc., Ed. 2019, págs. 161-162. Recientemente, nuestro más Alto Foro explicó que "[e]n otros términos, se modifica el delito y la pena a favor del acusado por las circunstancias que disipan la gravedad de la conducta, pues, sin estas, la persona incurriría en el delito de asesinato en primer grado o asesinato segundo grado. *Pueblo v. Guadalupe Rivera*, supra, págs. 633-634.

Cabe resaltar que el precitado Artículo 95 fue enmendado en virtud de la Ley Núm. 246-2014, con la cual se sustituyó el antiguo concepto de "arrebato de cólera" por el de *"perturbación emocional o mental suficiente"*. Con relación a la modalidad de asesinato

atenuado que es provocado por una perturbación mental o emocional suficiente, la tratadista Dora Nevares-Muñiz comenta lo siguiente:

> Bajo el texto vigente en este Código lo importante será determinar la razonabilidad de la perturbación emocional o mental suficiente ***ante las circunstancias del caso***. La pregunta del juzgador deberá ser si hay una excusa razonable para la perturbación emocional o mental que produjo una muerte, y no si hubo una provocación adecuada o no de parte de la víctima. La provocación, si la hubo, será un elemento, entre otros, para evaluar si existe una excusa razonable para la perturbación mental o emocional, que justifique atenuar la responsabilidad en el asesinato.
>
> [...]
>
> Si transcurre un lapso de tiempo durante el cual la persona recobra su dominio propio, o recapacita, entonces se trata de un asesinato. La norma a aplicar para determinar si el estado de pasión se ha enfriado viene de California [People v. Bush, 65 Cal. 129 (1884)] y consiste en el tiempo que le tomaría a una persona común, situada en circunstancias similares, salir del estado de pasión o excitación. Pueblo v. Román Marrero, 96 DPR 796 (1968) . Esta norma del período de enfriamiento permanece vigente en esta modalidad de súbita pendencia.
>
> En cambio, la norma sobre el periodo de enfriamiento no aplica con la rigidez de arriba y debe atemperarse al texto vigente en cuanto a la modalidad en que la persona, al momento de llevar a cabo el acto que culmina en una muerte, se encuentra bajo un estado de perturbación emocional o mental para el que hay una explicación o excusa razonable. Se ha aceptado que una conducta influenciada por una perturbación mental o emocional suficiente podría permanecer en el sub-consciente por un tiempo y aflorar posteriormente de forma inexplicable, aun cuando parezca que los ánimos se han enfriado. Ver People v. Casassa, 49 N.Y. 2d 668 (1980).
>
> D. Nevárez-Muñiz, op. cit., págs. 161-162. (Énfasis y subrayado nuestros).

En cuanto a la modalidad de asesinato atenuado provocado por súbita pendencia, el Tribunal Supremo ha aclarado que no se

requiere necesariamente una provocación previa, pues se trata de una pelea súbita, no reflexiva ni premeditada. *Pueblo v. Rivera Alicea,* 125 DPR 37, 46-47 (1989). Por consiguiente, para que se configure el asesinato atenuado por súbita pendencia, bastará demostrar la ocurrencia de ese tipo de pelea "a la cual se entra sin la intención previa de matar o de causar grave daño corporal". *Íd.*

Además, el Tribunal Supremo reiteró en *Pueblo v. Guadalupe Rivera,* supra, pág. 634, la norma establecida en *Pueblo v. Negrón Ayala,* 171 DPR 406, 417 (2007). Sostuvo que, con relación a las frases "súbita pendencia" y "arrebato de cólera", la circunstancia atenuante consistía en que el acto de la persona acusada fuere una reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con esta. Lo anterior, en virtud de la definición de "homicidio" que contenía el Código Penal de 1974, 33 LPRA ant. sec. 4004. Consignó, además, que el homicidio presuponía que el autor de la muerte actuara movido por una provocación adecuada de tal naturaleza que lleve a una persona ordinaria a perder su dominio y actuar según sus impulsos mentales causados por la cólera, pendencia o emoción violenta. Finalmente, aclaró que estos principios siguen vigentes en cuanto al delito de asesinato atenuado, por este requerir una "perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia". *Pueblo v. Guadalupe Rivera,* supra, pág. 634.

### E. Riesgo a la seguridad u orden público al disparar un arma de fuego

El Código Penal de Puerto Rico, supra, procura tomar las medidas necesarias para prevenir, controlar y reducir la incidencia de la actividad criminal. Exposición de Motivos del Código Penal, supra. Por eso, nuestro Legislador incorporó el Artículo 249, al

referido Código Penal, supra, sec. 5339, el cual regula el delito de riesgo a la seguridad u orden público, al disparar un arma de fuego, disponiendo lo siguiente:

> Será sancionada con pena de reclusión por un término fijo de veinte (20) años toda persona que, poniendo en riesgo la seguridad u orden público, a propósito, con conocimiento o temerariamente dispare un arma de fuego:
> (a) Desde un vehículo de motor, ya sea terrestre o acuático; o
> (b) en una discoteca, bar, centro comercial, negocio o establecimiento; o
> **_(c) en un sitio público o abierto al público._**

(Énfasis nuestro).

### F. Ley de Armas de 2020

Es principio arraigado a nuestro sistema de derecho que le corresponde a la Asamblea Legislativa tipificar los delitos, establecer si éstos serán graves o menos graves y la pena que deberá ser impuesta. *Pueblo v. Martínez Torres*, 116 DPR 793, 796 (1986). Con ello, lo que se persigue es que los tribunales, en su rol de interpretar la ley, no se excedan de sus funciones y adjudiquen las controversias a tono con la intención del legislador. *Meléndez v. Tribunal Superior*, 90 DPR 656, 659 (1964). Esta norma, conocida como el *principio de legalidad*, fue establecida estatutariamente y está consagrada en el Artículo 2 del Código Penal, 33 LPRA sec. 5002, donde se dispone lo siguiente:

> **_No se instará acción penal contra persona alguna por un hecho que no esté expresamente definido como delito en este Código o mediante ley especial_**, ni se impondrá pena o medida de seguridad que la ley no establezca con anterioridad a los hechos.

(Énfasis nuestro.)

A su vez, el Artículo 11 del Código Penal, supra, sec. 5011, establece que "[l]a pena o medida de seguridad que se imponga no podrá atentar contra la dignidad humana" y debe ser establecida "de forma proporcional a la gravedad del hecho delictivo." Por otro lado,

el Artículo 15 del Código Penal, supra, sec. 5015 define el termino delito como "un acto cometido u omitido en violación de alguna ley que lo prohíbe u ordena, que apareja, al ser probado, alguna pena o medida de seguridad."

De conformidad con el principio de legalidad, los estatutos penales deben ser interpretados de manera restrictiva cuando perjudique al acusado y liberalmente cuando le favorezca, ***pero dicha interpretación nunca deberá tener el efecto de alcanzar situaciones que no estén claramente previstas en la ley***. (Énfasis nuestro.) *Pueblo v. Figueroa Pomales*, 172 DPR 403, 417 (2007).

Por otro lado, la Segunda Enmienda de la Constitución de Estados Unidos le garantiza a todo ciudadano americano el derecho a poseer y portar armas. Sin embargo, dicho derecho es limitado, ya que el Estado puede regularlo, incluyendo el tipo de armas y los lugares donde se pueden portar las armas. En el interés de balancear este derecho y la regulación del mismo por el estado, se crea la nueva y actual Ley de Armas de Puerto Rico de 2020, en adelante, Ley de Armas 2020, 25 LPRA sec. 455 *et seq.* Por ser relevante al caso de marras, distinguimos los Artículos 6.01 y 6.14 de la Ley de Armas 2020, supra, seccs. 466 y 466m.

El referido Artículo 6.14 tipifica como delito grave el acto de apuntar o disparar un arma de fuego. En sus incisos (a) y (b), la disposición estatutaria en cuestión criminaliza el acto de apuntar o disparar sea hecho en lugares no autorizados por Ley, aun cuando no causa daño a terceros.

Finalmente, el Artículo 6.01 (previamente el Artículo 7.03 de la Ley de Armas de Puerto Rico, Ley Núm. 404-2000, 25 LPRA ant. sec. 460b) dispone cuando una persona resulta convicta por alguna de las disposiciones de la Ley de Armas 2020, usando "un arma en la comisión de cualquier delito y como resultado de tal violación,

alguna persona sufriera daño físico o mental, la pena establecida para el delito se duplicará". *Pueblo v. Concepción Guerra*, 194 DPR 291, 311 (2015).

El precitado Artículo 6.01 surgió ante la "necesidad de reevaluar su contenido para atemperarlo a las exigencias de nuestra sociedad" *Id.*, pág. 312. "Con ese fin, la Asamblea Legislativa aprobó la Ley Núm. 137-2004 para 'fortalecer las herramientas al alcance del sistema judicial y corregir lagunas existentes para penalizar severamente al delincuente que hace mal uso de la licencia de armas y sus permisos *así como el uso de armas y municiones ilegales'*". *Id.*, citando la Exposición de Motivos de la Ley Núm. 137-2004. (Énfasis nuestro). Fue al amparo de la precitada Ley que se enmendó la disposición estatutaria referente al agravamiento de penas, con el fin de "permitir, entre otras cosas, que la pena dispuesta para el delito imputado *pueda ser duplicada* si la persona acusada ha sido condenada anteriormente por cualquier violación a dicha ley". *Id.* (Énfasis nuestro).

### III.

Gutiérrez Rivera recurre ante nos impugnando la sentencia recaída en su contra, señalando como errores los delitos por los cuales fue convicto: asesinato atenuado, poner en riesgo la seguridad pública al disparar un arma de fuego, apuntar o disparar un arma de fuego a la luz de la Ley de Armas 2020, supra, y la duplicidad de la pena por virtud de la referida Ley. *No le asiste razón.*

En su *primer señalamiento de error*, alega el apelante que el TPI-Humacao lo encontró culpable del delito asesinato atenuado sin haberse probado el mismo más allá de duda razonable. Según el marco normativo antes reseñado, una persona que comete el delito de asesinato atenuado le quita la vida a otra a propósito, con

conocimiento o temerariamente, como consecuencia de una perturbación mental o emocional o súbita pendencia.

La jurisprudencia ha reconocido que una perturbación de esta naturaleza puede ser provocada por una súbita confrontación, que pueda razonablemente alterar el estado emocional o mental de una persona. Del testimonio de Tirado Gordon, quien estuvo presente cuando se dieron los hechos del caso, surge que momentos antes a los hechos delictivos, el occiso y el apelante se encontraban en una acalorada discusión, en la que se lanzaron insultos e improperios. Los ánimos entre ambos se elevaron tanto, que el testigo tuvo que intervenir físicamente.

Durante el contrainterrogatorio realizado por la defensa a Tirado Gordon, este logró establecer que previo a la interacción con el occiso, el apelante se encontraba tranquilo e inalterado.[38] Sin embargo, momentos luego de la primera interacción con el occiso, el apelante "de repente" se alteró.[39] Poco tiempo después de esta alteración mental y emocional, el Gutiérrez Rivera asesinó a la víctima de este caso. Los hechos creídos y evaluados por el Foro Apelado concuerdan con el resultado, justipreciando así que los elementos requeridos para el asesinato atenuado *sí se probaron.*

Ahora bien, recordemos que el referido quantum probatorio no exige que la prueba disipe toda duda o especulación posible. El juzgador de los hechos, a la luz de este estándar probatorio, cumple con sus funciones de manera adecuada si evalúa la totalidad de la evidencia de manera justa, imparcial y razonable, para llegar a una conclusión. También, resaltamos que la posición del Foro Primario es singular, con relación a la evaluación de la prueba. Es allí donde el juzgador puede, no solo escuchar la prueba, sino evaluar los manierismos de los testigos, las expresiones de estos y apreciar sus

---

[38] Transcripción de la prueba oral, págs. 104-105.
[39] *Id.*, pág. 105.

emociones. En consideración a la normativa que enmarca la evaluación de la prueba y el estándar probatorio aplicado el cuadro fáctico del caso, entendemos que *el Foro Apelado no erró.*

El apelante cuestiona el valor probatorio del testimonio de Tirado Gordon. Para que este Tribunal pueda intervenir con la apreciación de la prueba realizada por el Foro Primario, es importante que se haya dado un abuso de discreción, perjuicio o parcialidad de su parte. Sin embargo, luego de una sosegada lectura del testimonio vertido en el juicio, justipreciamos que no la hubo. El testimonio del testigo ocular de este caso – Tirado Gordon – fue esencialmente ratificado por el Agente Caraballo en el suyo. Además, puntualizamos que, conforme al derecho previamente reseñado, *un solo testimonio puede ser prueba suficiente para establecer un hecho.*

Además, según explicáramos previamente, las contradicciones están, de igual forma, sujetas a la apreciación del Foro Primario. Es decir, utilizar a una sola persona como testigo para establecer una serie de hechos, y que en sus declaraciones surjan contradicciones, no resulta en el descarte instantáneo de su testimonio. No habiendo distinguido perjuicio, parcialidad o error manifiesto en la evaluación del Foro Primario, nos vemos obligados a sostener su dictamen con relación al delito de asesinato atenuado.

En su *segundo y tercer señalamiento de error,* el apelante arguye que el TPI-Humacao se equivocó al encontrarlo culpable por el delito de riesgo a la seguridad u orden público al disparar un arma de fuego, sin haberse probado el mismo más allá de duda razonable. Específicamente, por haberlo hecho en un sitio público o abierto al público. Además, bajo el mismo fundamento, sostiene que erró el Foro Apelado al encontrarlo culpable de apuntar y disparar un arma de fuego, por virtud de la Ley de Armas 2020, supra.

Para establecer que este delito se cometió, la prueba desfilada debió establecer que el acusado disparó un arma de fuego en un

lugar público, a propósito, con conocimiento o temerariamente. Amparados en el mismo ejercicio de valoración y deferencia a la prueba aquilatada por el Foro Primario, concluimos que este no se equivocó en su determinación. Luego de evaluar los documentos que obran y la transcripción de la prueba oral desfilada en el juicio, justipreciamos que el TPI-Humacao no incurrió en perjuicio, error o parcialidad.

En su *cuarto señalamiento de error*, el apelante alega que el TPI-Humacao se equivocó al agravar su pena, por virtud de la Ley de Armas 2020, supra. Como vimos previamente, la precitada Ley, así como la jurisprudencia, impone al juzgador la obligación de duplicar la pena de la sentencia, cuando el acusado resulte culpable por violar el precitado cuerpo de leyes, y que el resultado de esa violación sea el daño físico de una persona.

De la prueba desfilada y creída por el Foro Primario, surge que el apelante apuntó y disparó un arma de fuego, en violación a la Ley de Armas 2020, supra, y que como resultado de esto, una persona perdió su vida, Además, quedó establecido más allá de duda razonable que los hechos de este caso se dieron en la Urbanización Villa Universitaria, frente a la Universidad de Puerto Rico. La letra de la Ley no da lugar a la discreción del juzgador para imponer o no la duplicidad de la pena cuando uno de estos elementos está presente. Es decir, al encontrarlo culpable de los delitos reseñados, el TPI-Humacao quedo estatutariamente sujeto a la aplicación de una pena doble. *Pueblo v. Concepción Guadalupe*, supra.

**IV.**

Por los fundamentos que anteceden, confirmamos la *"Sentencia"* apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del

Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones